UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF LOUISIANA

\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

WAYLAND COLLINS, ET AL.

                              Civil Action No. 18-7465
VS.                           Section "G"
                              New Orleans, Louisiana
                              November 23, 2021

JOHN C. BENTON d/b/a Q&M MOTOR
TRANSPORTS, ET AL.
\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*\*

TRANSCRIPT OF JURY TRIAL
HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
UNITED STATES CHIEF DISTRICT JUDGE
DAY 5

APPEARANCES:

FOR THE PLAINTIFFS:          Vanessa Motta
                             Motta Law, LLC
                             3632 Canal Street
                             New Orleans, LA 70119


FOR THE DEFENDANTS:          Morgan J. Wells, Jr.
                             Evan J. Godofsky
                             Larzelere, Picou, Wells,
                             Simpson, Lonero, LLC
                             Two Lakeway Center
                             3850 N. Causeway Blvd.
                             Suite 500
                             Metairie, LA 70002


Official Court Reporter:     Nichelle N. Wheeler, RPR, CRR
                             500 Poydras Street, B-275
                             New Orleans, Louisiana 70130
                             (504) 589-7775

    Proceedings recorded by mechanical stenography,
transcript produced via computer.

OFFICIAL TRANSCRIPT
Page 785

I N D E X

                                                            Page

CLOSING ARGUMENT BY MS. MOTTA                                803
CLOSING ARGUMENT BY MR. WELLS                                822

1        **P R O C E E D I N G S**

2                    (Call to order of the court.)

3           THE COURT:  We're not going to bring the jury in yet.

00:00:02  4    Make sure they can't hear me.

00:00:02  5           CSO:  What's that?

00:00:05  6           THE COURT:  Make sure they're in their room and they

00:00:05  7    can't hear me, the jurors.  I'm not ready for them.  Make

00:00:10  8    sure they're in their room before I start.

00:00:12  9           Y'all can have a seat for a minute.

00:00:16  10          So a couple of things have been on my mind as I

00:00:22  11   reviewed the jury instructions that I allowed -- you know,

00:00:30  12   that was the subject of our charge conference last night, and

00:00:36  13   there are two issues that I want these jury instructions to

00:00:42  14   address.  The first one is, I'm going to give you a little

00:00:51  15   background because I think it's important because I'm going

00:00:54  16   to add an instruction, unless you convince me otherwise, but

00:01:03  17   this -- after I -- let me get this out.

00:01:07  18          I went back and I reviewed Louis Fey's testimony and

00:01:12  19   the opinions he rendered during trial on November 22, 2021,

00:01:19  20   and the Court became concerned about certain information that

00:01:19  21   Fey referenced in explaining his -- he just referenced this

00:01:25  22   in explaining his conclusions, namely indictments and/or

00:01:27  23   arrests of individuals who are neither witnesses or parties

00:01:30  24   in this case.  As a general rule, evidence of an indictment

00:01:33  25   is not admissible as character evidence against a party or a

00:01:37  1  witness.  Federal Rule of Evidence 404(b)(1) provides that,

00:01:42  2  quote, "evidence of any other crime, wrong, or act is not

00:01:46  3  admissible to prove a person's character in order to show

00:01:51  4  that on a particular occasion the person acted in accordance

00:01:55  5  with the character."  However, pursuant to Federal Rule of

00:01:59  6  Evidence 404(b)(2), evidence of a crime "may be admissible

00:02:04  7  for another purpose, such as proving motive, opportunity,

00:02:10  8  intent, preparation, plan, knowledge, identity, absence of

00:02:12  9  mistake, or lack of accident."

00:02:15  10      The general rule of exclusion in Rule 404(b) only

00:02:20  11  excludes evidence of other crimes when offered to prove the

00:02:24  12  conduct of a person by resort to an inference as to his

00:02:28  13  character, indictments and arrests or other bad acts under

00:02:32  14  Rule 404(b).  However, the testimony and opinions provided by

00:02:36  15  Fey that reference mere arrests or indictments were not

00:02:41  16  referring to the character of a party or witness and thus

00:02:44  17  were not being used in a manner prohibited by Rule 404(b).

00:02:49  18  Therefore, the exclusions of Federal Rule of Evidence 404(b)

00:02:54  19  do not apply.

00:02:56  20      Moreover, Fey stated that whether or not someone is

00:02:58  21  indicted does not impact a decision to deny a claim because

00:03:05  22  an accident may have been staged.  Nevertheless, indictments

00:03:08  23  have been mentioned during the course of this trial.  The

00:03:10  24  policy behind Federal Rule of Evidence 404 is not implicated

00:03:14  25  here considering this information is more remote to the facts

00:03:18  1  of this case than if it were used against a witness or party.

00:03:23  2  Again, moreover, Mr. Fey testified that it was not necessary

00:03:26  3  for a person to be indicted or convicted to conclude that an

00:03:31  4  accident was staged.

00:03:33  5      But to eliminate any confusion that reference to

00:03:34  6  indictments or arrests may have created for the jury, the

00:03:38  7  Court will instruct the jury that an arrest or an indictment

00:03:40  8  is only an accusation against someone and is not indicative

00:03:49  9  of guilty.

00:03:50  10      And I plan to just include that as Jury Instruction

00:03:54  11  No. 6 to read in this case there was mention of indictments

00:03:58  12  and/or arrests of individuals who are neither parties or

00:04:02  13  witnesses in this case.  You should know that an indictment

00:04:04  14  is only a written formal accusation against a person charging

00:04:08  15  them with a crime.  You are not to consider the fact that a

00:04:12  16  person was indicted as evidence against that person.  You may

00:04:16  17  not infer guilt from the mere filing of an indictment.

00:04:22  18      Now, I thought through this a number of -- you know,

00:04:26  19  I think I thought through this completely.  I didn't feel

00:04:31  20  like it was evidence that should be stricken and I don't want

00:04:35  21  to strike the information, because if I do, neither one of

00:04:40  22  you, plaintiff or defendant, will be able to refer to it in

00:04:43  23  your closing.  And I think plaintiff's counsel spent a lot of

00:04:46  24  time going through each of those cases and asking a lot of

00:04:50  25  questions about, you know -- about who was indicted and who

00:04:56  1  was connected to whatever and I imagine you may want to clear

00:05:00  2  that information up because I don't know that you actually

00:05:04  3  got anyone to say that -- or maybe you did, but I don't think

00:05:09  4  you got a witness to say that, that an indictment is not a

00:05:13  5  conviction or be able to explain what that is.

00:05:17  6       You know, on the other hand, when I look at

00:05:23  7  defendant's point of view, I don't think it was necessary.  I

00:05:28  8  look at the totality of the information, and all of his red

00:05:34  9  flags, even the mention of indictments had come in through

00:05:38  10  plaintiff's own witnesses, through cross-examination in

00:05:42  11  plaintiff's case-in-chief anyway.  So I don't think that that

00:05:45  12  would hurt, but I am -- before I include them, include that

00:05:51  13  explanation of indictment, it just bothers me that this is a

00:05:54  14  civil trial and they have had no explanation of what an

00:06:00  15  indictment is and I don't want them to be confused about

00:06:04  16  that.

00:06:04  17       Does anybody want to be heard on that issue?  I don't

00:06:07  18  want to make it a bigger deal, you know what I mean, but I

00:06:11  19  just -- like I said, I researched it and I thought about it.

00:06:16  20  You know, I've said to you my evaluation of Rule 404 and how

00:06:24  21  I come down on that.  This is a -- you know, I don't think

00:06:29  22  this is a set of facts that necessarily -- you know, there

00:06:36  23  are clear rules.  I'm going to have to interpret these rules,

00:06:41  24  and what I am trying very hard to do is make sure that these

00:06:45  25  jury instructions are clear and are comprehensive and match

00:06:52  1  the evidence that was -- the information in this case.  So

00:06:57  2  with regard to that, if anybody would like to be heard.

00:07:04  3       MS. MOTTA:  I mean, Your Honor, the 404 is as if my

00:07:07  4  clients were indicted.  These were people that had -- they

00:07:10  5  had no connection.  They didn't talk about the connection and

00:07:14  6  it was just -- it's a 403 issue.  It was prejudicial.  There

00:07:19  7  was no probative value to his testimony, which is what I said

00:07:23  8  from the get-go because when I looked at all the documents

00:07:25  9  that he did provide --

00:07:25  10      THE COURT:  Well, I think you go too far.  I'm going

00:07:27  11  to stop you there.  There was probative value to his

00:07:29  12  testimony.  And I did weigh whether the prejudicial value of

00:07:35  13  just mentioning these indictments outweigh the probative

00:07:41  14  value, and I don't think it does because it just really --

00:07:47  15  you know, he clearly said, because I asked the question,

00:07:50  16  whether these people are indicted or not, because you have to

00:07:53  17  look at the totality of all of these red flags, wouldn't

00:08:00  18  change his expert opinion as to whether or not the accident

00:08:03  19  was staged.  Now, why he mentioned it, I don't think it's

00:08:09  20  relevant.  It was as relevant in my -- just my opinion, I

00:08:17  21  think whether he said it or not.

00:08:19  22       I mean -- because what I considered is, do I -- again, do

00:08:22  23  I just strike his reference?  Tell the jury to strike, but

00:08:27  24  then you're not going to be able to explain.  You know, once

00:08:30  25  I strike it and I'm telling you, Ms. Motta, you have a

00:08:34  1  pattern of when I instruct you not to do something, you do it

00:08:38  2  and I'm not going to allow a mistrial by you saying something

00:08:43  3  in front of that jury.  So this is one the reasons I wanted

00:08:46  4  to talk to you all about it.  So I disagree.

00:08:49  5      I don't think his entire opinion is -- is so prejudicial

00:08:54  6  that it outweighs its probative value.  I think you are wrong

00:08:59  7  on that.  Because let me say this very clearly, it should

00:09:03  8  not -- and it is not the law.  We're talking about civil

00:09:07  9  claims and criminal claims, and it certainly is not the law

00:09:10  10  that an action has to rise to the level of a crime to prevent

00:09:17  11  an insurance company from denying a claim.  That would be

00:09:21  12  ridiculous.  And if this kind of behavior, if defendants are

00:09:26  13  successful, if this kind of behavior did occur, then clearly

00:09:31  14  it should be stopped both civilly whether or not someone is

00:09:34  15  convicted of a crime for doing it or not because that would

00:09:38  16  be bad behavior against all our societal norms and it is

00:09:44  17  isn't okay to think just because it's an insurance company

00:09:48  18  someone can create a scam and get money out of them.  That is

00:09:53  19  not okay whether you go to jail for doing it or not.

00:09:56  20      So that's why, you know -- and for an expert -- what

00:10:00  21  an expert does, they look at facts and information and draw

00:10:07  22  some conclusions that support an opinion.  And I did look

00:10:12  23  carefully to make sure -- I was listening carefully to all

00:10:19  24  the -- what he considered a red flag and they had come in.

00:10:22  25  They had come in.  So all he did was render an opinion.  And

00:10:26  1   the jury can either believe him.  You spent a lot of time.  I

00:10:29  2   gave you extra time.  In fact I gave you all the time you

00:10:30  3   wanted.  I said take all the time you want, all the time you

00:10:34  4   need, and -- and you took it and you had a vigorous

00:10:43  5   cross-examination of him such that -- and I say that to you

00:10:47  6   as a compliment, such that I wanted to go back and make sure

00:10:53  7   that I was clear on what 404 allowed and didn't and I was

00:10:58  8   clear that as you admit that it didn't reference a witness or

00:11:02  9   a party, it was more remote.

00:11:10  10       Now, the information is hard to hear and the

00:11:19  11  information I'm sure was upsetting, but sometimes facts just

00:11:27  12  are and it is for the jury to decide which of these facts,

00:11:31  13  which version of these facts, is more probably true than not,

00:11:38  14  and to deprive the defendants of their defense I think is

00:11:48  15  inappropriate.  And so that is -- you know, like it or not,

00:11:51  16  upsetting, it's terrible I'm sure to hear, for the plaintiff

00:11:56  17  to hear those things about themselves, but that is their

00:12:00  18  defense.  And as I said, I don't think the law is that it has

00:12:04  19  to rise to the level of a crime for -- I'm confident in that,

00:12:09  20  for an insurance company to be able to say I'm not paying

00:12:12  21  this claim; this is staged.  So that's where I fall on it.

00:12:16  22       Defense counsel, Mr. Wells?

00:12:18  23       MR. WELLS:  Just briefly.

00:12:19  24       THE COURT:  And I am -- I'm kind of exasperated

00:12:24  25  because I didn't sleep thinking about this, because I know

00:12:28    1    how important these issues are to both of your clients and

00:12:33    2    this -- this has made this a very intense trial.  So please,

00:12:37    3    go ahead, Mr. Wells.

00:12:39    4        MR. WELLS:  Just a quick response, Your Honor.  I

00:12:42    5    think it's a little disingenuous from plaintiff's counsel to

00:12:46    6    assert that it's prejudicial at this point when no objections

00:12:48    7    were made during his testimony and the great majority of that

00:12:51    8    information came out during cross-examination by plaintiff's

00:12:53    9    counsel.  With that said, we think the court's proposed

00:12:56   10    instruction relative to the indictment is reasonable and we

00:12:59   11    have no objection to it.

00:13:00   12        THE COURT:  All right.  So considering all that, I'm

00:13:03   13    going to exclude it.  I feel more comfortable.  I think they

00:13:08   14    -- you know, they should know because they haven't been

00:13:10   15    instructed on that.

00:13:12   16        And one other thing that -- so, you know, we went

00:13:16   17    over a lot, our original, which would have been your last

00:13:22   18    night's draft.  This jury instruction is going to be No. 6.

00:13:26   19    Between last night's No. 6 and No. 7.  And, again, I

00:13:44   20    struggle.  Last night's 6, which is now 7, is true, a

00:13:49   21    treating physician's opinion and testimony is entitled to

00:13:52   22    more weight than the opinion and testimony of a doctor who

00:13:54   23    examines an injured party for consultation and litigation

00:13:56   24    purposes.  We all agree that's true.

00:14:00   25        Jury Charge No. 7 talks about experts.  In this case,

00:14:09    1    some treating physicians and others were qualified as experts

00:14:16    2    by the Court -- I mean were qualified -- I'm sorry -- were

00:14:21    3    qualified and accepted by the Court as experts in their

00:14:26    4    field.  So treating physicians and others were qualified and

00:14:30    5    accepted by the Court as experts in their field.

00:14:34    6         Ms. Motta, you know, last night you acknowledged that

00:14:38    7    you know you had some treating physicians.  Now, you weren't

00:14:42    8    allowed to -- because you had -- you know, an expert can be

00:14:49    9    -- there are two kinds of experts.  One -- some certain of

00:14:52    10   them have to file a report ahead of trial and some others

00:14:56    11   don't.  A treating physician can be an expert that isn't

00:15:02    12   required to file a report ahead of trial, but they're still

00:15:08    13   an expert and you offered them and I accepted some of those

00:15:13    14   treating physicians as experts.  My concern is or what I'm

00:15:19    15   going to do after -- in jury -- I'm going to leave 6 the way

00:15:22    16   it is, about giving more weight to a treating physician, that

00:15:26    17   is the law, but No. 7, I will add -- the first sentence, it

00:15:32    18   says:  When knowledge of technical subject matter may be

00:15:35    19   helpful to the jury, a person who has special training or

00:15:39    20   experience in that technical field is permitted to state

00:15:42    21   their opinion on those technical matters as an expert

00:15:46    22   witness.

00:15:47    23     In this case, some of the testifying physicians and

00:15:49    24   others were qualified and accepted by the Court as experts in

00:15:54    25   their field.  You, the jury -- I'll leave everything else

00:15:59  1  because I don't want the jury to think that just because

00:16:02  2  someone, you know, was a treating physician that in and of

00:16:09  3  itself -- they come to the conclusion that they have got to

00:16:12  4  accept that testimony because there's something different

00:16:16  5  from an expert because they may not pick up -- they may --

00:16:20  6  you know, they need to understand clearly that a treating

00:16:24  7  physician can also be an expert because they were offered as

00:16:27  8  an expert to know that both Jury Charge No. 6 and No. 7

00:16:33  9  apply, not 6 alone, because, you know, that could cause them

00:16:39  10  to disregard the fact that, you know, you've got competing --

00:16:45  11  you've got competing expertise, but even with a treating

00:16:50  12  physician who is an expert, they can out -- you know, still

00:16:53  13  like any expert can evaluate their background, the facts that

00:17:00  14  they relied on, and, you know, their professional

00:17:06  15  qualifications and experience, because that is true, that is

00:17:10  16  true to treating physicians who are experts.  They're just

00:17:14  17  experts who don't have to provide a report prior to trial.

00:17:19  18  So I'd like to hear from the both of you on that.

00:17:26  19       MS. MOTTA:  I mean, Your Honor, like I said last

00:17:29  20  night, they were not given an opportunity to talk beyond

00:17:32  21  their medical records in regards to Metropolitan or any prior

00:17:36  22  records.  However, defense was able to do that with their

00:17:40  23  experts because --

00:17:40  24       THE COURT:  And let me tell you the difference.  You

00:17:44  25  did offer and you -- you offered and I accepted some of these

00:17:54 **1** treating physicians, all of them, as qualified in their

00:17:58 **2** fields and as experts.  They did not provide an expert report

00:18:03 **3** prior to trial, correct?  So because they did not -- you

00:18:08 **4** characterized them as a treating physician who isn't -- and

00:18:12 **5** they are an expert; but because they didn't provide a report

00:18:17 **6** for trial, then you're not allowed under the rules of

00:18:23 **7** evidence then to have them opine as if they were an expert

00:18:30 **8** who had provided a report prior to trial, because an expert

00:18:35 **9** who is providing a report prior to trial is going beyond just

00:18:40 **10** being a treating physician.

00:18:42 **11**      They are -- and this is the information you tried to

00:18:45 **12** admit, other records and information from other people, not

00:18:51 **13** information based solely on them treating the individual.  In

00:18:56 **14** fact, in one, I specifically remember that doctor had stopped

00:19:01 **15** treating the defendant in May of 2017 or 2019, you know, and

00:19:06 **16** so, no, he's not treating him anymore.  If he were to opine

00:19:11 **17** and give a conclusion based on medical evidence from other

00:19:14 **18** people that are treating him and not him treating him, then

00:19:17 **19** he would have -- it's not that he couldn't testify as an

00:19:21 **20** expert.  It was you didn't follow the discovery rules.  He

00:19:26 **21** would have had to have filed a report to put defendants on

00:19:27 **22** notice that he is relying more than on his knowledge, his

00:19:33 **23** firsthand knowledge and information from treating the

00:19:36 **24** plaintiffs.  So that is why these treating physicians who are

00:19:41 **25** experts, some of them are not allowed to provide expert

00:19:47  1    testimony outside of information, their firsthand information

00:19:53  2    and knowledge.  I mean, you can disagree with the rationale,

00:19:57  3    but --

00:19:57  4        MS. MOTTA:  Right, but then that was the same with

00:19:59  5    Dr. Robert.  He didn't have in his report anything about

00:20:01  6    Metropolitan that was beyond the scope of his record.  He

00:20:04  7    didn't review those records and yet he was able to have an

00:20:06  8    opinion about it.  And so -- and it was a standard that he

00:20:09  9    was an expert, but that was beyond the scope of the report,

00:20:12  10   which is why I was objecting.

00:20:14  11       THE COURT:  Let me hear from you.

00:20:15  12       MR. WELLS:  With respect to Dr. Robert --

00:20:17  13       THE COURT:  So he wasn't a treating physician?

00:20:19  14       MR. WELLS:  He's a retained --

00:20:21  15       THE COURT:  Right.  He was an expert.  You provided a

00:20:23  16   report?

00:20:24  17       MR. WELLS:  And he testified about his review of the

00:20:29  18   diagnostic studies from both before and after the accident

00:20:30  19   and explained that to the jury.  What I questioned him at the

00:20:34  20   end after cross-examination from counsel of plaintiffs, is I

00:20:34  21   displayed the Metropolitan records that showed the prior

00:20:38  22   complaints and treatment to Mr. Collins and asked him if Mr.

00:20:42  23   Collins ever told him anything about that.  And he said no.

00:20:44  24   He didn't render any specific opinion about those records

00:20:47  25   because Mr. Collins never told him about it.

00:20:49   1        With respect to Dr. Lonseth, Dr. Lonseth testified

00:20:52   2   that he stopped treating and in his deposition never had any

00:20:56   3   prior records or subsequent records, never had any records

00:21:00   4   other than his own records and his testimony was limited to

00:21:03   5   that.  And then on direct examination, counsel for plaintiff

00:21:07   6   tried to get him to render opinions beyond that.

00:21:11   7        Also, all of the treating physicians were tendered

00:21:13   8   and accepted by the Court as an expert in their particular

00:21:17   9   field and they rendered an opinion on causation, specifically

00:21:21  10   they testified that the injuries in their treatment was

00:21:23  11   related to the accident.  Therefore, they are an expert and

00:21:27  12   it's subject to --

00:21:28  13        THE COURT:  Right.  She just didn't have to file a

00:21:30  14   report.

00:21:30  15        MR. WELLS:  That's correct.

00:21:30  16        THE COURT:  Because they were -- they were the

00:21:34  17   treating physician.  I'm not going to rehash decisions that

00:21:38  18   were made in trial because I did.  I'm only pointing out that

00:21:44  19   because -- I don't want there to be confusion on the jury

00:21:47  20   that a treating physician is somehow because of No. 6 treated

00:21:50  21   differently.  They're still an expert and they don't have to

00:21:55  22   necessarily accept whole -- unquestionably, right, the

00:22:04  23   opinion of a treating physician.

00:22:06  24        And, you know, look, Jury Charge No. 7, Ms. Motta, is

00:22:11  25   a strong charge in your favor, but, again, to be true to the

00:22:17  1   evidence in this trial, I want to make sure there's no

00:22:20  2   confusion, you know, I'm compelled to at least include a

00:22:25  3   sentence that in this case, some treating physicians and

00:22:28  4   others, right, but I want to say treating physicians because

00:22:33  5   they have to know because it is true they were qualified and

00:22:36  6   accepted by the Court as experts in their field.

00:22:39  7       I'm not telling them now -- but they need to know in my

00:22:43  8   opinion that they fall under both categories and that is what

00:22:47  9   I'm trying to clarify.  Because I think it would be an awful

00:22:51  10  miscarriage of justice if I allowed this jury to think that

00:22:57  11  treating physicians are just separate in this category,

00:23:00  12  all -- all on their own, and it didn't matter that this jury

00:23:06  13  charge overrides the fact that I did accept them as an expert

00:23:11  14  and they are -- you know, they are held to that standard, but

00:23:15  15  at the same time, they are -- they're not by No. 6 required

00:23:21  16  to just accept completely because they were a treating

00:23:25  17  physician what their opinions were as experts; and that's why

00:23:31  18  I want that -- if you could recommend -- that's the best

00:23:35  19  wording I can come up with.  We struggled with it last night.

00:23:39  20  I didn't like defense counsel -- I didn't like your wording,

00:23:42  21  not to be harsh, but I was uncomfortable, you know.  You

00:23:46  22  didn't get me there to make me feel like, you know, I don't

00:23:49  23  want these instructions to -- to tip one way or another.  I

00:23:53  24  want them to be informative, accurate, and neutral.  And by

00:24:01  25  the same time, sometimes you have to -- these instructions

00:24:04    1    often in many of these sort of lead with some fact of the

00:24:09    2    particular case.

00:24:10    3        So other than your general objection, I understand

00:24:13    4    that.  I respect it, Ms. Motta.  I just disagree as to how

00:24:20    5    those experts are to be characterized.

00:24:24    6        Mr. Wells?

00:24:25    7        MR. WELLS:  No further comment, Your Honor.

00:24:27    8        THE COURT:  All right.  So those are the two

00:24:29    9    suggestions -- I mean, two changes I'm going to make.  I'm

00:24:34   10    going to add an instruction on with the definition of

00:24:39   11    indictment and I'm going to add the sentence I just told you

00:24:44   12    to now -- the new instructions on indictments is going to be

00:24:50   13    No. 6 and Jury Charge No. 6 is now going to be No. 7 and I'm

00:24:56   14    going to add the sentence I just told you all to No. 7.  So

00:25:00   15    we'll take a brief recess while I get that and bring it back

00:25:03   16    out to you all.

00:25:05   17        But other than that, did you catch any other

00:25:08   18    typographical errors or something you need to bring to the

00:25:13   19    Court particularly on the -- it was pretty late last night

00:25:15   20    when we looked through the verdict form.  Are you both

00:25:21   21    comfortable with the verdict form, the instructions and the

00:25:25   22    verdict form?

00:25:25   23        MR. WELLS:  I think so, Your Honor.

00:25:25   24        THE COURT:  All right.

00:25:25   25        MR. WELLS:  The only thing I wanted to mention is

00:25:26  1    that Chris Oaks, from Northland, had a flight to catch this

00:25:29  2    morning, so he was unable to -- he was going to stay through

00:25:31  3    closing, but he had to leave to catch his flight --

00:25:35  4            THE COURT:  I understand.  I'm not at all insulted,

00:25:39  5    but thank you for bringing that to my attention.  So let's

00:25:43  6    take a brief recess and let me get this fixed.

00:25:47  7            THE CASE MANAGER:  All rise.

00:25:48  8                    (Recess taken.)

00:43:44  9            THE COURT:  One thing before I bring the jury in, I

00:43:52  10   just want to remind everyone that in your closing arguments

00:43:54  11   you're not to reference, you know, any reason why this case

00:43:56  12   was continued from last Wednesday to Monday.  So I just want

00:44:03  13   to remind everybody.

00:44:04  14           And I am going to say in front of the jury just to

00:44:07  15   make sure that it was in the record, I'm going to ask

00:44:10  16   plaintiffs if they rest their entire case, I'm going to ask

00:44:16  17   defendants if they rest their entire case and then say we'll

00:44:20  18   now proceed to closing arguments.

00:44:22  19           MR. WELLS:  Just maybe a caution to plaintiff's

00:44:26  20   counsel that she should not refer to any injuries of

00:44:29  21   Ms. Kelly.  She questioned a witness about and mentioned that

00:44:33  22   she had surgery.  That's inappropriate.

00:44:35  23           THE COURT:  Because she settled her case.  I did

00:44:39  24   allow just to clear up any confusion, right, that she settled

00:44:42  25   her case but that's the extent.  You're clear about that.

00:44:47　**1**　　　　　　　MS. MOTTA:  I'm sorry?

00:44:48　**2**　　　　　　　THE COURT:  You're clear about that.

00:44:50　**3**　　　　　　　MS. MOTTA:  Yeah.

00:44:50　**4**　　　　　　　THE COURT:  All right.

00:44:55　**5**　　　　　　　THE CASE MANAGER:  All rise for the jury.

00:45:43　**6**　　　　　　　　　　(Jury enters courtroom.)

00:46:03　**7**　　　　　　　THE COURT:  Good morning, ladies and gentlemen of the

00:46:04　**8**　jury.  Please have a seat.

00:46:08　**9**　　　　　　　All right.  Have you rested your entire case?

00:46:13　**10**　　　　　　　MS. MOTTA:  Yes, Your Honor.

00:46:13　**11**　　　　　　　THE COURT:  Defendants, have you rested your entire

00:46:15　**12**　case?

00:46:15　**13**　　　　　　　MR. WELLS:  Yes, we have, Your Honor.

00:46:16　**14**　　　　　　　THE COURT:  We will now proceed to closing arguments.

00:46:20　**15**　After which time, I'll instruct the jury on the law.  Ms.

00:46:24　**16**　Motta.

00:46:48　**17**　　　　　　　　　　　CLOSING ARGUMENT

00:46:48　**18**　　　　　　　MS. MOTTA:  I haven't started yet.  Hold on.

00:47:24　**19**　　　　　　　May I, Your Honor?  Is that okay?  Thank you.

00:47:28　**20**　　　　　　　Good morning, ladies and gentlemen of the jury.  I'd

00:47:41　**21**　like to thank you for taking the time for being here and

00:47:44　**22**　appreciate for my clients and myself.  I've got 20 minutes so

00:47:49　**23**　I'm going to recap as much as I can, be thorough, but also

00:47:54　**24**　give you as much detail as I can.

00:47:57　**25**　　　　　　　I want to take you back to the day of the accident of

00:47:58  1  what happened with my clients.  Now, you remember Dr. John

00:48:02  2  Smith.  He came in and he explained exactly what occurred.

00:48:05  3  He gave you an at-fault analysis and said that Mr. Ingle did

00:48:10  4  not change lanes safely.  That was not in dispute.

00:48:13  5  Defendants have brought over an expert just experienced,

00:48:18  6  doing it over 20 years and defendants told him, don't do an

00:48:22  7  at-fault analysis.  Don't tell the jury what happened.  Why?

00:48:26  8  That's what he does in his normal business.  He got paid over

00:48:30  9  $20,000 and said I'm not going to tell you who's at fault.

00:48:34  10  He also didn't dispute what John Smith said, who was at

00:48:39  11  fault.  And that's something that is important to realize.

00:48:42  12        They talked about the property damage.  Property

00:48:47  13  damage was not minor.  Property damage showed exactly what

00:48:51  14  happened in this case.  Now, there was conversations from

00:48:55  15  both experts that talked about the jarring.  That wasn't in

00:48:59  16  dispute about the jarring, but once the jarring happened, no

00:49:03  17  one can tell you if it's front or back or back and front.

00:49:07  18  And even Baratta said, okay, well, plaintiffs went faster

00:49:10  19  hypothetically.  Let's say they did.  They owned the lane.

00:49:14  20  It wasn't true, but even if it was true, they were in their

00:49:18  21  lane.  Mr. Ingle had a burden to be safely on changing lanes,

00:49:24  22  end of story.  But that's all Baratta could say.  He couldn't

00:49:27  23  talk about who's at fault.

00:49:30  24        Inconsistent statements began in the body cam.

00:49:38  25        (Video playing.)

| | |
|---|---|
| 00:49:42 | **1** |
| 00:49:47 | **2** |
| 00:49:50 | **3** |
| 00:49:53 | **4** |
| 00:49:58 | **5** |
| 00:50:00 | **6** |
| 00:50:11 | **7** |
| 00:50:15 | **8** |
| 00:50:20 | **9** |
| 00:50:23 | **10** |
| 00:50:27 | **11** |
| 00:50:30 | **12** |
| 00:50:33 | **13** |
| 00:50:38 | **14** |
| 00:50:42 | **15** |
| 00:50:44 | **16** |
| 00:50:51 | **17** |
| 00:50:57 | **18** |
| 00:51:03 | **19** |
| 00:51:08 | **20** |
| 00:51:12 | **21** |
| 00:51:15 | **22** |
| 00:51:17 | **23** |
| 00:51:19 | **24** |
| 00:51:23 | **25** |

Can you hear that?  I never seen him.  That was an honest thing.  He didn't see him.  It's okay if it's an accident.  Things happen.  You didn't see him.  But after a couple of minutes, officer went again and talked to him and said --

(Video playing.)

He remembers seeing some cars coming.  When you're an 18-wheeler, even a normal driver, when cars come up on you and go in your blind spot, you need to make sure they are out of your blind spot before you change lanes.  That's a standard rule, but it's more important when you're driving an 80,000-pound vehicle.  That's the importance of this.  You are trained and experienced to make sure to know that you do it safely.  But when the officer went to him for a third time, he said:

(Video playing.)

And he changes his story again.  So within the hour, it was I didn't see him, most honest one, to I saw cars coming, he changed lanes, he admitted he changed lanes and to all of a sudden accusing them that they hit him and he didn't see it because they were flying.  It's the inconsistent statements that started.

Well, why is that so important?  It's important because rules are not meant to be broken when you are a commercial driver.  You have those FMCSA rules that you need

| | | |
|---|---|---|
| 00:51:27 | 1 | to follow.  This is a driver who has been driving over |
| 00:51:29 | 2 | 30 years.  Very well experienced.  He knows the rules of |
| 00:51:33 | 3 | safety regulations.  Why?  Because they have this book in |
| 00:51:35 | 4 | their vehicle at all times.  They sign it.  They know it and |
| 00:51:39 | 5 | they follow it.  They know it.  Even if for any reason he |
| 00:51:41 | 6 | didn't have it, he had a policy with Q&M having a policy of |
| 00:51:46 | 7 | what to do after an accident for drug and alcohol test |
| 00:51:49 | 8 | policy.  He signed it knowing I acknowledge it, I have it, |
| 00:51:54 | 9 | I'm going to follow it, but didn't do that here. |
| 00:51:58 | 10 | There was supposed to be a post-accident drug and |
| 00:52:00 | 11 | alcohol testing.  Nothing was ever done.  Whether it was |
| 00:52:05 | 12 | positive or negative, we'll never know.  The problem is is |
| 00:52:08 | 13 | that there's a reason why FMCSA have these rules to consider |
| 00:52:12 | 14 | -- negate it.  If they're going to dispute who's at fault, |
| 00:52:16 | 15 | why not do that.  Why not get it out of the way so it's one |
| 00:52:19 | 16 | less checkmark, be like, ah-ha, I didn't do it, but they |
| 00:52:23 | 17 | didn't do it at all.  They just let it go. |
| 00:52:26 | 18 | He was okay with texting and phone calls of over four |
| 00:52:30 | 19 | hours of driving nonstop.  He wants to say that it's voice |
| 00:52:32 | 20 | activating.  It's still distracting.  You're driving an |
| 00:52:37 | 21 | 80,000-pound vehicle.  They testified that it was okay to |
| 00:52:40 | 22 | look down 90 feet.  If you think of 90 feet, that's a |
| 00:52:43 | 23 | football field.  That's going bigger than this.  And looking |
| 00:52:45 | 24 | down when you're driving something of that vehicle, you need |
| 00:52:48 | 25 | to be safe.  And looking down when doing that while changing |

00:52:52  1   lanes is another reason why you wouldn't see a vehicle.  He

00:52:55  2   has a duty to be safe at all times when he is getting paid to

00:53:00  3   travel interstate and doing the work that he was doing as a

00:53:01  4   commercial driver.

00:53:02  5          Surveillance, inadequate surveillance, and you heard

00:53:06  6   Mr. Cole talk about how you're supposed to look at your

00:53:09  7   mirrors every three to five seconds.  That's mandatory.

00:53:12  8   That's something that they learn in training.  Again,

00:53:14  9   30 years of experience commercial driver, didn't do that.

00:53:19  10          Safety has never been a priority, but it started well

00:53:23  11  before the driver.  It started with the owner.  The owner had

00:53:26  12  a duty to have a driver safety training and orientation

00:53:30  13  program.  He didn't have one.  He admitted on the stand,

00:53:34  14  didn't have one.

00:53:35  15          Now, why is that important?  In order to get a DO --

00:53:38  16  an MC carrier, so it's a motor carrier number, you need to

00:53:42  17  make sure that you have an oath and say I promise under the

00:53:45  18  penalty of perjury that you are going to have this.  If not,

00:53:48  19  it's a crime and it's a serious crime.  And that's one thing

00:53:53  20  they don't take lightly.

00:53:54  21          MR. WELLS:  Your Honor, I hate to interrupt and

00:53:57  22  interject during closing arguments, but she's putting up

00:54:01  23  information that's not in evidence and it's based on claims

00:54:04  24  that have been dismissed.

00:54:05  25          MS. MOTTA:  I'm sorry.  It was evidence.  Mr. Cole

00:54:08  1  spoke about it in his --

00:54:10  2       THE COURT:  Wait.  Hold on.  Don't talk in front of

00:54:12  3  the jury.  Hold the time.  Y'all approach.

00:54:14  4       WHEREUPON, the following proceedings were held at the

00:54:14  5  bench:

00:54:19  6       MR. WELLS:  First of all, she had that statement up

00:54:21  7  there that he lied on his application where there are no

00:54:25  8  words to that effect whatsoever that he lied on the

00:54:27  9  application to get the job.  There was no evidence of that --

00:54:28  10      MS. MOTTA:  That's not the application.  That's about

00:54:31  11  the OP-1 form.

00:54:32  12      THE COURT:  His testimony is that he didn't know

00:54:36  13  anything about it.  That's the risk -- penalized for not

00:54:40  14  disclosing that and some of the evidence was brought as

00:54:43  15  impeachment purposes only because I'm not sure it was for

00:54:47  16  impeachment purposes only, and she should have used it that

00:54:50  17  way, but nevertheless, he said he had never seen that

00:54:53  18  document before --

00:54:54  19      MS. MOTTA:  No, he didn't.  He said he had signed --

00:54:57  20      THE COURT:  No.  He said maybe it had to do with a

00:55:00  21  Hertz thing, but he had never seen the notice suspending his

00:55:05  22  license --

00:55:05  23      MS. MOTTA:  Wait.  We're talking about Benton, not

00:55:08  24  Ingle.  This is an OP-1 for a motor carrier.

00:55:11  25      MR. WELLS:  You're saying he lied to get a job --

00:55:13    1              MS. MOTTA:  No.

00:55:15    2                      (Simultaneous speaking.)

00:55:16    3              MR. WELLS:  Let me finish.  She said -- the only one

00:55:21    4    who would fill out an application to get a job would be

00:55:23    5    Ingle, right?  Benton --

00:55:23    6              MS. MOTTA:  I didn't say application.

00:55:25    7              MR. WELLS:  You said he lied on his application.

00:55:28    8              MS. MOTTA:  I never --

00:55:28    9                      (Simultaneous speaking.)

00:55:30    10             MS. MOTTA:  This is a motor carrier application.  I

00:55:32    11   just talked about a motor carrier.  That's the company and

00:55:34    12   Larry Cole spoke about it.

00:55:35    13             THE COURT:  But you didn't say motor carrier.

00:55:40    14             MS. MOTTA:  I said MC is motor carrier.

00:55:43    15             THE COURT:  That is not what that demonstrative said,

00:55:46    16   but you took it down.  She took that slide down.

00:55:50    17             You know, what's the recommendation?  You want to

00:55:57    18   address it, give more time in your closing or you want me

00:56:00    19   to -- are you asking for an instruction?  I mean, look, I

00:56:05    20   agree.  I just looked at that demonstrative and I said

00:56:07    21   obviously they didn't share demonstratives --

00:56:07    22             MR. WELLS:  No.

00:56:10    23             THE COURT:  -- before because it said he lied to get

00:56:12    24   a job, which insinuates -- I thought you were talking about

00:56:16    25   the car because it came after you talked -- you said the

00:56:21  **1**   driver had made inconsistent statements and then look what

00:56:24  **2**   else he did and so now you're telling me lying on a job

00:56:29  **3**   application --

00:56:29  **4**         MS. MOTTA:  No, that's Benton.  Larry Cole --

00:56:32  **5**         THE COURT:  You didn't make that --

00:56:33  **6**         MS. MOTTA:  I did.  Larry Cole said it.  He read that

00:56:35  **7**   whole thing to the jury.

00:56:36  **8**         THE COURT:  That's not what I'm talking about.

00:56:39  **9**   That's not what your slide said and --

00:56:41  **10**        MR. WELLS:  It said he lied --

00:56:42  **11**        THE COURT:  -- it said he lied, not the company, the

00:56:45  **12**  company owner.

00:56:46  **13**        MR. WELLS:  And she tries to use an expert person to

00:56:49  **14**  say -- I know it wasn't his testimony, so it's taken

00:56:52  **15**  completely out of context --

00:56:53  **16**        MS. MOTTA:  He said he never had a driver and safety

00:56:56  **17**  orientation program.

00:56:57  **18**        THE COURT:  Well, what I'm going to do -- do I bring

00:56:58  **19**  more attention to it?  I mean, it stayed up there a while,

00:57:01  **20**  the sentence that Ms. Motta put up there would say he lied on

00:57:05  **21**  his job application, is not referring to --

00:57:10  **22**        MR. WELLS:  The testimony of Mr. Ingle.

00:57:13  **23**        THE COURT:  He lied on job application.  What did she

00:57:20  **24**  --

00:57:20  **25**        MS. MOTTA:  It wasn't the job application, Your

00:57:22    **1**    Honor.

00:57:22    **2**    THE COURT:  That's what you wrote up here.

00:57:25    **3**    MR. WELLS:  That's what the specific --

00:57:26    **4**    THE COURT:  Go get the slide.  Go get it.  That's not

00:57:46    **5**    the one.

00:57:47    **6**    MR. WELLS:  The one before.  That's the one before.

00:57:49    **7**    MS. MOTTA:  No, that's this one.

00:57:50    **8**    THE COURT:  No.  I am saying I want to see the one

00:57:51    **9**    before.

00:57:56    **10**    MR. WELLS:  That one.

00:57:56    **11**    THE COURT:  That one.

00:57:57    **12**    MR. WELLS:  Yes.  Oh, I'm sorry.

00:57:57    **13**    MS. MOTTA:  I thought you were talking about OP-1.

00:57:59    **14**    I'm sorry.  I thought -- I was on this one.

00:57:59    **15**    THE COURT:  No.

00:57:59    **16**    MR. WELLS:  I thought I was clear what my objection

00:58:06    **17**    was.

00:58:06    **18**    MS. MOTTA:  Well, you were saying your objection here

00:58:08    **19**    when I was doing this one so my apologies.

00:58:10    **20**    THE COURT:  That bullet -- that first bullet point,

00:58:14    **21**    his license was suspended and lied on his application to get

00:58:17    **22**    a job.

00:58:18    **23**    MR. WELLS:  We just request the Court to give the

00:58:22    **24**    jury an instruction on that bullet point that was not

00:58:24    **25**    supported by the evidence.

```
00:58:27   1              MS. MOTTA:  That was not intentional --

00:58:27   2              THE COURT:  I'm sorry.  What?

00:58:28   3              MS. MOTTA:  That was not intentional.  That was part

00:58:30   4    of my --

00:58:30   5                         (Simultaneous speaking.)

00:58:32   6              MR. WELLS:  It was prohibited.

00:58:32   7              THE COURT:  So you -- wait.  You can say -- it may go

00:58:37   8    over better that way -- you misstated on that, that's a

00:58:39   9    misstatement on or they get it from me.  So if it was truly a

00:58:45  10    misstatement, I think you should tell the jury, go back to

00:58:48  11    that slide and --

00:58:49  12              MS. MOTTA:  And say please disregard the first one.

00:58:53  13    I'm happy to do that --

00:58:55  14              MR. WELLS:  Let me see the next one.

00:58:58  15              MS. MOTTA:  The next one's been absolved.  That was

00:59:04  16    the OP-1 form.

00:59:10  17              MR. WELLS:  That's fine.

00:59:12  18              THE COURT:  So you're going to put it back up there.

00:59:23  19                         (In open court.)

00:59:40  20              MS. MOTTA:  Ladies and gentlemen of the jury, there

00:59:45  21    was one sentence that I actually need to -- so sorry.  My

00:59:51  22    computer went off for one second.  That I need to -- oh, my

00:59:59  23    gosh.  Can we pause for a second?  We're having technical

01:00:02  24    issues.

01:00:25  25              Ladies and gentlemen of the jury, I want to please
```

01:01:08  1    ask you to disregard the top line that says that Ingle

01:01:15  2    admitted his license was suspended, lied on his application,

01:01:19  3    so please disregard that specific sentence.  My apologies on

01:01:22  4    that.

01:01:23  5         As I was saying, safety has never been a priority

01:01:27  6    with this company and here's why.  When they do that OP-1

01:01:31  7    form which is to get that motor carrier number, they need to

01:01:35  8    do exactly -- they take an oath and they have to do the seven

01:01:38  9    factors and one of the factors was -- is about driving,

01:01:41  10   safety and training orientation program.  Mr. Benton never

01:01:44  11   had one.

01:01:45  12        And why is that important?  Because that talks about

01:01:47  13   how to drive safely.  It talks about what happens if you

01:01:51  14   don't drive safely and then talks about testing that needs to

01:01:54  15   be done if there is a collision and none of that was in place

01:01:57  16   here.  And that's a huge issue because FMCSA has this and

01:02:00  17   makes you sign this and there's actually penalties in doing

01:02:03  18   that.  This is started as a safety issue from the company and

01:02:06  19   just keeps trickling down even with the drivers.

01:02:09  20        Why do defendants want to ignore the evidence?

01:02:12  21   Here's why.  They bring in a retired insurance adjuster and

01:02:16  22   to talk about red flags.  Well, what are red flags?  He's

01:02:20  23   given documents by the defendants, getting paid $400 an hour

01:02:24  24   to talk about what the defendants want them to hear.  You

01:02:28  25   heard him.  He got documents from the defendants.  But what

01:02:31  **1**  he didn't get was the totality of the paperwork.  He didn't

01:02:35  **2**  get the deposition of the driver.  He didn't get the

01:02:37  **3**  deposition of the company.  He didn't get the deposition of

01:02:39  **4**  the officer who was the investigating officer.

01:02:42  **5**      And then when discussing about the body cam, he says, oh,

01:02:46  **6**  wait, there was no audio.  I didn't hear.  That's not looking

01:02:49  **7**  at all the facts.  That's not looking at the totality of it.

01:02:53  **8**  It was just about how can we try to taint these plaintiffs

01:02:56  **9**  because they didn't want to look at the evidence.  They had

01:02:58  **10**  hundreds of adjusters from Northland that could have come and

01:03:01  **11**  said, hey, look, we did this investigation.  Did their expert

01:03:04  **12**  do that?  No, expert didn't even talk to Northland.  He

01:03:07  **13**  didn't want to know the truth.  He's like, oh, gosh, please

01:03:10  **14**  don't tell me the truth.  So I'm just going to show my own

01:03:12  **15**  thing.  And when I asked him, did you investigate it?  No, I

01:03:15  **16**  don't need to do that.  That's like you being accused of

01:03:18  **17**  something and they have no evidence to back up.  You have to

01:03:21  **18**  back up and look at the truth.

01:03:23  **19**      And when asking him about him having his business records

01:03:27  **20**  cell phone being subpoenaed, he didn't care.  He's like, no,

01:03:29  **21**  look, I have nothing to hide.  And he goes and looks in phone

01:03:33  **22**  numbers and he's like, ah-ha, I found someone who had an

01:03:36  **23**  accident in 2015.  Never spoke with him.  Wasn't like an

01:03:39  **24**  ongoing conversation.  And defense had papers to show there

01:03:42  **25**  was an order of a -- of shirts on the day before the

01:03:46  1   collision.  Did he get that?  No, he didn't.  Didn't want to

01:03:51  2   hear it, because, again, it would change the facts of his

01:03:55  3   story, not to what the truth is, but it would change what the

01:03:58  4   actual facts were and that would hurt him.  So he didn't want

01:04:01  5   to know that.  But it was clear as day.

01:04:03  6          You're going to hear about a jury charge about a

01:04:08  7   simple mistake by a witness or whether they remembered it or

01:04:12  8   not or whether they told the truth.  Now, as you know -- and

01:04:15  9   I don't take any like please feel sorry, because it's not.

01:04:18  10  My clients are such hardworking men.  I've known them for

01:04:23  11  four and a half years.  It has been an honor to be

01:04:28  12  representing them, from seeing Wayland's son grow, from Candy

01:04:32  13  being pregnant on, and it's like my own son that I wish I

01:04:34  14  had.  Okay.  And Alvin, Alvin is an amazing man.  He adopted

01:04:36  15  a little girl who is now 11 years old.  People don't just

01:04:40  16  adopt children just for kicks.  They do it because they're a

01:04:45  17  caring, hardworking person that loves children and these are

01:04:48  18  both hardworking men.  But they don't have the best

01:04:50  19  education.  They don't have the education that -- Mr. Wells

01:04:52  20  is an excellent attorney and knows how to smooth the words,

01:04:56  21  but they don't understand it.  But during this litigation

01:04:59  22  process, they wanted to make sure that everything was out in

01:05:02  23  the open.  And so why does this matter?  Because they signed

01:05:04  24  this thing called a HIPAA release, okay, and that's just to

01:05:07  25  say, here, go look at all my medical records, go look at my

01:05:10  1  employment, go look at everything, I have nothing to hide.

01:05:13  2  And they did that.  They gave all those records to them to

01:05:16  3  make sure they can review it.

01:05:18  4       Now, when we look at those records, what we see is is

01:05:21  5  that we have Wayland that had a prior -- had 10 visits with

01:05:25  6  the chiro and saw someone and the last visit was February of

01:05:29  7  2016.  Soft tissue.  No MRIs.  No nothing, nothing that shows

01:05:34  8  that there was any significance and he's 18 months of

01:05:38  9  free-pain work.  Nothing.  There's no medical record to

01:05:41  10  dispute that.  And defendants know that.  Doctors know that.

01:05:44  11  There's nothing to show that.

01:05:45  12       We have Alvin.  Alvin treated.  Now, he did have a

01:05:50  13  prior MRI.  No one is disputing that, but after that, he had

01:05:54  14  12 months of pain-free living.  He was a commercial driver.

01:05:57  15  In order to have a commercial driver's license and to work as

01:06:00  16  a commercial driver, you need to have that medical card to

01:06:02  17  say, hey, I'm healthy and there's no dispute on that.  Why?

01:06:05  18  Because you're driving an 80,000-pound vehicle and you need

01:06:09  19  to be safe on the road.  And he was driving until the day of

01:06:12  20  the collision.  There's no dispute on that.  There's no

01:06:14  21  dispute that there was 12 months of pain-free.

01:06:16  22       Now they want to talk about how Alvin didn't tell

01:06:21  23  anyone about a prior MRI and we're going to get to that.

01:06:24  24  There's going to be another jury charge about a treating

01:06:28  25  physician's opinion has more weight than the defendants --

01:06:31  1          MR. WELLS:  Your Honor, it's inappropriate for

01:06:34  2   counsel to show the jury charges prior to the jury being

01:06:37  3   charged by the Court.  This is inappropriate for closing

01:06:39  4   arguments.

01:06:40  5          THE COURT:  I'll allow it and the jury will be

01:06:42  6   instructed that you're not to take any jury charge out of

01:06:48  7   context.  You don't give any more weight to any particular

01:06:51  8   jury instruction.  You have to consider all of them as a

01:06:54  9   whole.

01:06:56  10         MS. MOTTA:  And why is -- why is it important to talk

01:06:59  11  about Alvin Polk's prior MRI?  Dr. Liechty was here.  He said

01:07:05  12  Alvin was forthright in talking about a prior.  What he said

01:07:08  13  was, is that he had an image.  See, sometimes people don't

01:07:12  14  know what MRI is.  They say like an image.  They say a

01:07:16  15  machine if you kind of try to kind of explain it to them.

01:07:18  16  But Alvin wanted to go to the same place where he had his

01:07:22  17  other MRI.  That's how we know.  And how do we know that?

01:07:25  18  Because the MRI facility does a comparison.  They do a

01:07:28  19  comparison from the prior MRIs to the current MRIs.  So some

01:07:32  20  people like to see the visual of the spine of what

01:07:35  21  Dr. Liechty showed and showed how the discs were different

01:07:38  22  that now is impinging more.  But let's say you don't want

01:07:41  23  visuals.  Let's say you're economics and you want numbers.

01:07:45  24  Well, here's the numbers that came from the radiologist.

01:07:48  25  I've always said images don't lie.  It's there.  Well, a

01:07:51   1   radiologist has no dog in this fight.  They're talking about

01:07:54   2   how there is the change and this was the straw that broke the

01:07:57   3   camel's back.  Instead of just having an MRI in the past and

01:08:01   4   moving on, this became the permanent injury on Alvin Polk.

01:08:03   5   And it shows that it was worse.

01:08:06   6       And then we talk about Wayne Collins.  Never had an

01:08:09   7   MRI before, was fully healthy before this collision until he

01:08:15   8   had a neck and back surgery.  Now you heard different

01:08:18   9   testimonies in regards to the neck.  To tell yourself --

01:08:22   10  Dr. Robert said, well, the herniation was there.  There's no

01:08:25   11  doubt about that.  He was injured but, you know, I just don't

01:08:28   12  know what caused that neck -- that herniation.  But there's

01:08:31   13  nothing to show prior.  He said it was degenerative and when

01:08:36   14  clearly asking him does degenerative mean that you can be

01:08:40   15  asymptomatic and what that means is that you're not in pain.

01:08:43   16  He was like, well, yeah.  Well, that makes sense.  He had no

01:08:47   17  record showing that he had an MRI and showing any significant

01:08:50   18  pain before.  But this isn't just a small -- this came from a

01:08:53   19  copy and paste from the DIS records of the MRI showing that

01:08:55   20  there is a disc in there and shows the measurement of it.

01:08:59   21      Then we look at the back.  He talks about how the

01:09:01   22  back was completely clear and everything.  Again, I go about

01:09:05   23  the images.  It says a grade four tear.  You can't create

01:09:08   24  this.  You can't make this up.  An image is the truth on

01:09:12   25  that.  And that's what it showed.  So, obviously, a

01:09:17  1  radiologist that once again has no fight is showing the facts

01:09:21  2  on this.

01:09:21  3      Now, as is, my clients -- you find them as they are.

01:09:27  4  Some people get hurt more frequently, more easily, but you

01:09:30  5  find the plaintiffs as they are and there's this thing called

01:09:33  6  to me -- I call it as "as-is justice."  Even if someone had

01:09:36  7  priors and they healed, doesn't mean that they get a discount

01:09:40  8  to what they deserve from a permanent injury.  It mean that

01:09:44  9  you find them as they lie.

01:09:47  10     Now, you were given -- you're going to be given a

01:09:50  11  bunch of exhibits, a listing to a total cost of everything

01:09:54  12  and here are the bills that was for Alvin Polk that has been

01:09:56  13  current for this collision.  And it goes straight from the

01:10:00  14  emergency room for the day of the collision and it goes all

01:10:02  15  the way down.  And this was for -- just for Mr. Polk.

01:10:06  16  There's futures that were involved that you heard from

01:10:09  17  Dr. Sapp, or excuse me, Dr. Lastrapes that came from Dr. Lacy

01:10:14  18  Sapp.  And this is the future life care plan and they did a

01:10:17  19  range because sometimes you want to make sure you don't

01:10:20  20  overfund and you don't underfund and so you have to make sure

01:10:23  21  there's a range of what's going on.

01:10:25  22     Now, if you recall, Dr. Robert did give a separate

01:10:28  23  future care plan if you were to follow that in regards to Mr.

01:10:32  24  Polk.  Of course, he was not the treating physician.  He

01:10:34  25  still has not seen Mr. Polk since 2019 and has no updated

01:10:41   1    records to go from that.  Mr. Polk is still treating.

01:10:43   2        When discussing with Wayland, this is currently his

01:10:45   3    bills.  That's a high amount.  Why?  Because he had

01:10:50   4    significant injuries.  He had neck and back and that's the

01:10:53   5    significant part of it, is that this is a man who incurred

01:10:56   6    this much money and is owed this much money.

01:11:00   7        The future care plan, his is a little bit different

01:11:02   8    as discussed because, again, he had neck and back and he's

01:11:07   9    still treating and the same thing that Dr. Robert recommended

01:11:10   10   on a future care plan after seeing him one time for about 15

01:11:15   11   minutes versus someone who's been seeing him for four and a

01:11:18   12   half years and has this plan for him, he was still trying to

01:11:20   13   say that Mr. Collins should be getting pain management.  Pain

01:11:24   14   management is not chiro.  He obviously knows that the

01:11:29   15   herniation is related to the collision.  Why would you offer

01:11:33   16   pain management in this case.

01:11:34   17       This is in regards to Wayland and Alvin's freedom.

01:11:39   18   It's the things that have been taken from them.  No one likes

01:11:42   19   their freedom to be taken.  These are the list of items that

01:11:47   20   were taken from Wayland and Alvin.  If they could take back

01:11:50   21   and not have this injury, I promise you they would.  But they

01:11:54   22   didn't control this.  They didn't plan this.  This isn't

01:11:57   23   something they expected.  This is people that want to live

01:12:01   24   their life.  Mr. Collins wants to go back to church every

01:12:04   25   Sunday and sit in those heavy, hard pews and not be in so

01:12:06  1   much pain.  It doesn't mean that they're not going to be able

01:12:08  2   to do these things.  It just means that when they wake up in

01:12:11  3   the next morning, are they going to be able to take the pain.

01:12:14  4   That's really what it's about.

01:12:17  5      What you value here is the little things that count that

01:12:19  6   we take for granted when we wake up from bed.  We jump up

01:12:24  7   from bed and we get up and go brush our teeth.  They have to

01:12:25  8   roll out of bed and take their time.  Those are the little

01:12:26  9   factors that we take in.  Those are things that happen for

01:12:29  10  older and people who have gone through their lives the whole

01:12:32  11  way.  They became 80-year-old people at a younger age.

01:12:35  12  That's really what it is.  Instead of letting natural take

01:12:40  13  its course, it was sped up for them because of this

01:12:44  14  collision.

01:12:44  15      These are the general damages.  I said in the

01:12:46  16  beginning in my opening why I believe that Alvin's case is

01:12:49  17  worth over 700 and why Wayland's is worth over 1.7, and I did

01:12:53  18  it in two type of models that I believe are fair and

01:12:57  19  reasonable.  I call it the per diem.  It's not like a per

01:13:03  20  diem of work.  It's per diem of like a health.  For Alvin,

01:13:04  21  because he had only one area, I said the $5 a day.  If you

01:13:08  22  talk about every day he's in pain, the 35 years is what the

01:13:11  23  life expectancy was, you know, with Dr. Lastrapes and it

01:13:15  24  showed that per diem.

01:13:16  25      If you were to multiply past medical bills on an

01:13:19    1    average of times three, it came up with the -- I call it the

01:13:22    2    multiple of economics damage and that's just if you want to

01:13:24    3    deal with numbers.  And that was the same thing for Wayland.

01:13:28    4    Please keep in mind that this is the verdict of all time for

01:13:31    5    Wayland and Alvin.  They don't get to come back later and do

01:13:35    6    updates and get more money for medical treatment as they're

01:13:38    7    still treating.  And please know this is not about how much

01:13:41    8    money they're going to be getting.  It was about how much was

01:13:45    9    taken and what is a fair value to that.

01:13:47    10        And I appreciate the time you've taken.  I know you

01:13:50    11   guys are going to take an oath and look at the facts and the

01:13:54    12   evidence.  And that's all I ask, is to follow the facts and

01:13:57    13   the evidence with the law that's going to be given to you.

01:14:00    14   Thank you so very much.  We truly do appreciate it.

01:14:20    15                        CLOSING ARGUMENT

01:14:20    16        MR. WELLS:  It's still in the morning.  Good morning,

01:14:32    17   ladies and gentlemen.  Again, I know we went into a second

01:14:36    18   week.  Very much appreciate your time.  Your service is very

01:14:39    19   important as a juror in a case like this and in particular in

01:14:43    20   a case like this.

01:14:45    21        I want to emphasize something I said at the beginning

01:14:48    22   of the case, that this case is a matter of credibility.  Are

01:14:51    23   you going to believe two gentlemen who have a financial

01:14:55    24   interest in the outcome of this case who have lied throughout

01:14:58    25   this entire case that is supported by the evidence, which I

01:15:01  1    will show you and remind you of, who have been in multiple

01:15:06  2    accidents over short periods of time who file lawsuits, who

01:15:10  3    seek claims, who go to doctors they don't tell anybody about,

01:15:13  4    do you believe them, or do you believe a gentleman, Mark

01:15:17  5    Ingle, who's been driving an 18-wheeler for 30 years without

01:15:22  6    an accident except for this one, which is suspicious at the

01:15:25  7    very least or staged at the very worst?

01:15:28  8         This entire case has been orchestrated.  If you

01:15:32  9    notice the theatrics from plaintiff's counsel during her

01:15:33  10   closing statement, it was nothing but bullet points.  I want

01:15:36  11   you to go back and compare what she said with the actual

01:15:39  12   evidence in the case.

01:15:40  13        These two gentlemen have been here for two weeks as

01:15:44  14   you have been.  This whole lawsuit has impacted the Court,

01:15:48  15   the jury, their lives over this incident, which is not

01:15:55  16   deserving of the Court's time.  There are things that have

01:16:03  17   been orchestrated since the very day of the accident about

01:16:08  18   how the accident happened.  Their version of the accident is

01:16:10  19   not supported by the evidence.  The only comment that counsel

01:16:13  20   for plaintiff made on her opening was from their expert to

01:16:18  21   say that Mr. Ingle changed lanes into the vehicle driven by

01:16:23  22   the plaintiffs.  But the -- the version that he gave was a

01:16:27  23   side impact.  There was no side impact damage whatsoever.

01:16:31  24   That was explained by Dr. Baratta during his testimony.  The

01:16:34  25   damage to the vehicle was front to forward as if they hit the

01:16:40  **1**  side of the 18-wheeler and pushed the left front end

01:16:42  **2**  backwards.  That not only contradicts what they said how the

01:16:46  **3**  accident happened, but it also supports that the plaintiff's

01:16:48  **4**  vehicle was going faster than the 18-wheeler at the time.

01:16:51  **5**       There was testimony from Mr. Fey about all of these

01:16:55  **6**  other suspicious accidents and the most astounding thing is

01:17:01  **7**  how they're all similar in fact pattern.  There was a spotter

01:17:05  **8**  who Mr. Ingle testified and I'll show you the body cam video,

01:17:10  **9**  a spotter who flagged him down and said, hey, you hit

01:17:14  **10**  somebody.  Mr. Ingle pulls over and several minutes later,

01:17:18  **11**  the plaintiffs arrive in their vehicle.  There's not been --

01:17:21  **12**  other than Mr. Polk and Mr. Collins, there's not been one

01:17:22  **13**  single witness that testified that they saw Ms. Kelly in the

01:17:25  **14**  vehicle with them at the time of the impact.  This whole case

01:17:28  **15**  has been orchestrated.  And I'll show you the body cam video

01:17:32  **16**  about their injuries.  They didn't have a single complaint at

01:17:35  **17**  all.  They moved around freely.  They spoke freely.  Yet when

01:17:39  **18**  they went to their treating physician, Dr. LeBlanc, who is on

01:17:42  **19**  a contingency fee with plaintiff's counsel, she doesn't

01:17:45  **20**  recover unless they're successful in the lawsuit, that's who

01:17:48  **21**  they were sent to two days after the accident and she said

01:17:50  **22**  they had immediate pain in their neck, in their back.  She

01:17:53  **23**  even reported in her medical records that Mr. Polk had

01:17:56  **24**  difficulty walking and was experiencing balancing problems

01:17:59  **25**  immediately after the accident.

01:18:01    **1**        Let's go to the body cam video.  And this was taken

01:18:06    **2**   on the day of the accident.

01:18:07    **3**                 (Video playing.)

01:18:12    **4**        I want you to notice the lack of concern.  Mr.

01:18:16    **5**   Collins didn't know where they took his wife.  And they

01:18:19    **6**   specifically denied that they were injured.

01:19:05    **7**                 (Video playing.)

01:19:05    **8**        Watch how freely Mr. Polk moves his neck.

01:20:09    **9**                 (Video playing.)

01:20:09   **10**        And they moved and then the next clip is taken

01:20:13   **11**   further interviewing the witnesses at the scene.

01:20:19   **12**                 (Video playing.)

01:21:00   **13**        Not needing any medical treatment.

01:21:04   **14**                 (Video playing.)

01:21:11   **15**        Not one sign of complaint whatsoever.

01:21:16   **16**        This is Mr. Ingle's, when he's being interviewed by

01:21:23   **17**   the police officer after the accident.

01:21:26   **18**                 (Video playing.)

01:21:29   **19**        That's the spotter.

01:21:31   **20**                 (Video playing.)

01:21:38   **21**        Had no idea.  He has been driving for 30 years.  He

01:21:42   **22**   knows how to change from one lane to another safely.  He has

01:21:46   **23**   driven millions of miles and has never had an accident, yet

01:21:49   **24**   this one occurs?

01:21:51   **25**        Look at the -- that's the damage from the body cam

01:21:55  1    video.  You see the left front end, you can even see the

01:21:59  2    headlight, the left headlight is kind of pushed backwards.

01:22:03  3    But the damage is from front to back.  That's not from back

01:22:08  4    to front as if the 18-wheeler was going faster.  That's clear

01:22:08  5    proof, as explained by Dr. Baratta, that the damage was front

01:22:12  6    -- towards the back of the vehicle.  He also explained from

01:22:15  7    the State Farm photos that were taken after the accident of

01:22:19  8    damage to the door that was pushed backwards.  That's clear

01:22:22  9    evidence that the Nissan Juke was going faster than the

01:22:25  10   18-wheeler and ran into the 18-wheeler on the day of the

01:22:29  11   accident.

01:22:31  12          The other issue about credibility is the -- or

01:22:36  13   another oddity about the accident itself is that it took the

01:22:40  14   plaintiffs two hours to get from Kenner to New Orleans East.

01:22:45  15   They picked up Ms. Kelly who was sitting or sitting for a

01:22:50  16   lady, an elderly lady, on Clay Street and Kenner right by

01:22:56  17   plaintiffs counsel's office at the time.  That's just

01:22:58  18   circumstantial.  Just consider that.  And then it took them

01:23:01  19   two hours to get from that point to this accident scene?

01:23:04  20          If there was so much traffic, how come there were no

01:23:08  21   witnesses to the accident?  If there were so many witnesses

01:23:10  22   on the road, so many cars on the road, not a single

01:23:12  23   eyewitness to the accident?  That's another peculiarity.

01:23:17  24          Now, we have the timeline of the accidents involving

01:23:24  25   each plaintiff.  First of all, Wayland Collins, remember, I

01:23:30  1    took his deposition.  We read you the deposition testimony,

01:23:32  2    asked him if he ever had any prior neck or back problems,

01:23:35  3    neck pain, medical treatment at any time before this

01:23:39  4    accident.  His testimony was no.  Now, that's a pretty simple

01:23:43  5    question to understand.  Have you ever had neck or back pain

01:23:46  6    before the accident?  No.  Any prior medical treatment before

01:23:49  7    this accident?  No.  That's not complicated.  But they

01:23:53  8    weren't forthright and they weren't truthful.

01:23:56  9         Then he has another accident that he sought medical

01:24:00  10   treatment for and then the accident at issue and then another

01:24:03  11   accident.  And the thing is, counsel for plaintiff said we

01:24:08  12   provided information to our experts.  Yes, we provided all of

01:24:10  13   the information to our experts.  What she did was provide

01:24:14  14   information only related to this accident.  Remember Dr.

01:24:18  15   LeBlanc?  Dr. LeBlanc had separate files set up for each

01:24:22  16   accident.  There were two or three for Mr. Polk.  She would

01:24:25  17   examine them on one day and create three separate billing

01:24:29  18   files for the plaintiff's counsel at the request of the

01:24:32  19   plaintiff's counsel and she didn't get paid until that

01:24:34  20   lawsuit settled.  She has a financial interest in the outcome

01:24:39  21   of that case and this case.

01:24:41  22        Now, here's the timeline of the treatment.  And don't

01:24:44  23   believe me what I'm saying.  Base your verdict on the

01:24:48  24   evidence.  What plaintiff's counsel did was put a bunch of

01:24:53  25   bullet points that had nothing to do with the evidence.  This

01:24:54   1    is the evidence.

01:24:55   2         December 29, 2014, Mr. Wayne Collins, date of the

01:25:01   3    accident, December 26, 2014, patient is a 39-year-old male

01:25:06   4    who reports neck pain, back pain and left elbow pain.

01:25:11   5    Patient states while riding in the vehicle, another vehicle

01:25:13   6    cut in front of them and struck the passenger side of the

01:25:16   7    vehicle in which he was riding.  I've never seen individuals

01:25:20   8    who get involved in more sideswipe accidents than these

01:25:23   9    individuals.  He states the pain was immediate.  He gets

01:25:27  10    medications.

01:25:29  11         Then March 17, 2015, I'm highlighting what's shown in

01:25:34  12    the medical records.  March 17, following the same accident,

01:25:39  13    Dr. Alden again, the patient comes in complaining of neck

01:25:43  14    pain, back pain, and left elbow pain related to the motor

01:25:46  15    vehicle accident.  Mr. Collins is stating that his neck pain,

01:25:48  16    back pain, and elbow pain are 10/10.  Pain with range of

01:25:54  17    motion.  You think you would remember that if you gave a

01:25:56  18    deposition.

01:25:58  19         Then he goes to Dr. Prempeh at the same facility on

01:26:05  20    December 3, 2015, following another accident, and here's the

01:26:09  21    medical record to support that, here's the evidence to

01:26:12  22    support that.  Another accident December 1, 2015, reports

01:26:18  23    neck and back pain.  Patient was involved in a motor vehicle

01:26:21  24    accident, look at the history, patient denies any pain prior

01:26:25  25    to this accident.  I just showed you the medical records.  He

01:26:29  1    was 10/10.  Patient denies -- patient reports previous motor

01:26:35  2    vehicle accident December of 2014 resulting in residual

01:26:39  3    injuries to his neck and back.

01:26:41  4        Then he complains of neck and back pain in January of

01:26:44  5    2016.  Patient reports neck and back pain.  Pain scale for

01:26:47  6    neck and back is 8/10 respectively.  Pain is off and on and

01:26:52  7    is aggravated by any and all activity.  You think you would

01:26:55  8    remember that in a deposition given just a year or so later.

01:26:59  9    Patient reports tingling to the right arm.  Well, you get

01:27:01  10   tingling to the right arm if there's an impact on a disc

01:27:05  11   that's compressing a nerve.  That's what right arm pain comes

01:27:10  12   from.  Patient states treatment is helping and states

01:27:11  13   medication is also helping.

01:27:13  14       Next report, February 5, 2016, pain scale is 8/10 for

01:27:21  15   -- remember this all before the accident.  Pain scale 8/10

01:27:27  16   for back pain is off and on aggravated by any and all

01:27:29  17   activity.  Patient reports radiating pain into his right arm.

01:27:35  18   Patient reports tingling in his right arm.  Well, that's a

01:27:38  19   disc compressing on a nerve root to cause those symptoms and

01:27:39  20   right hand.  Patient states medication is not helping.  He

01:27:43  21   will continue with medications.

01:27:45  22       Then we have the treatment with Dr. LeBlanc.  Here

01:27:47  23   are x-rays -- that's objective evidence.  Subjective is what

01:27:51  24   they tell you and it's subject to being credible or not.

01:27:55  25   Objective, x-rays, MRI studies, films that you can actually

01:27:58  1   see, videotape, that's objective evidence.  Plain film AP and

01:28:04  2   lateral radiographs of the cervical and lumbar regions

01:28:08  3   revealed no evidence of recent fracture dislocation or gross

01:28:11  4   pathological alteration.  Why is that important?  That shows

01:28:14  5   there is no recent event that is shown on the x-rays.

01:28:17  6       If you remember Dr. Robert, we specifically had

01:28:19  7   Dr. Robert look at the MRI films, pull up the MRI films, look

01:28:25  8   at the discs involved and he explained what you would expect

01:28:29  9   to see on an MRI study that's taken within two months of an

01:28:33  10  accident, edema, swelling, hemorrhages; they're are all

01:28:37  11  things that would be shown on that photograph of the spine.

01:28:39  12  None of that existed.  That's why he said none of that is

01:28:44  13  related to this accident of August 9, 2019.  That's why we

01:28:49  14  got him to look at the entirety of the picture.

01:28:55  15      This is the radiologist.  This is the radiologist.

01:28:58  16  This isn't Dr. Liechty who sees tons of patients for Ms.

01:29:04  17  Motta.  This is the radiologist who interprets the L2-3 disc.

01:29:09  18  There is no disc bulge or herniation superimposed on disc

01:29:17  19  desiccation.  No acquired neurocompressive midline, lateral

01:29:20  20  recess or foraminal stenosis.  Facet joint is noted

01:29:20  21  bilaterally.  Essentially it's normal at that level and

01:29:25  22  that's essentially what Dr. Robert said.  There was no need

01:29:26  23  for surgery on either level.

01:29:29  24      And then he goes to Dr. Liechty at the referral of

01:29:35  25  counsel again.  Collins reported he experienced immediate

01:29:40  **1**   neck and back pain.  I showed you the body cam video.  No

01:29:44  **2**   records of prior accidents or medical treatment.  I just

01:29:45  **3**   showed those to you.  What Dr. Liechty's opinion is based on

01:29:49  **4**   and you'll hear jury charge to this effect, what his opinions

01:29:53  **5**   are based on are what the plaintiffs tell him.  If they don't

01:29:57  **6**   give him any other information about any prior accidents or

01:30:00  **7**   subsequent accidents, which he was involved in, he has no

01:30:03  **8**   other basis then to relate it to the accident, but it's based

01:30:06  **9**   on incomplete, inaccurate, and false information.

01:30:10  **10**  June 15, 2018, this is before Dr. Liechty does the

01:30:15  **11**  surgery.  Mr. Collins did not report -- this is Dr. Liechty's

01:30:21  **12**  testimony.  He didn't tell me about January 2018 accident.

01:30:26  **13**  But he said at that time he's doing neurologically well.

01:30:30  **14**  What does that indicate?  If you're doing neurologically

01:30:32  **15**  well, there's no reason to do surgery.  And that's the

01:30:35  **16**  report.  I'm showing -- I'm giving you the highlights and

01:30:38  **17**  then I'm showing the report that actually supports what I'm

01:30:41  **18**  showing you.  June 15, '2016, a report to Ms. Motta.  On

01:30:47  **19**  exam, he is neurologically well.

01:30:52  **20**  Now, I told you that Dr. LeBlanc, the chiropractor,

01:30:58  **21**  saw Mr. Polk and Mr. Collins for different accidents.  This

01:31:01  **22**  is an initial report.  Date of accident, January 20, 2018.

01:31:07  **23**  We had the pleasure of seeing Mr. Collins for our clinical

01:31:10  **24**  evaluation of musculoskeletal injuries sustained in a motor

01:31:14  **25**  vehicle crash that occurred on January 20 of 2018.  That's

01:31:17  1   three months after our accident.  Symptoms:  Neck pain, upper

01:31:22  2   back pain, midback pain, low back pain, radiating pain down

01:31:26  3   the left lower extremity.  Causation statement:  These

01:31:31  4   injuries more probable than not are due to the motor vehicle

01:31:34  5   accident of January 20, 2018.

01:31:43  6            THE CASE MANAGER:  Three minutes.

01:31:45  7            MR. WELLS:  How much?  3?

01:31:47  8            Dr. Liechty predicted maximum medical improvement.

01:31:52  9   In May of 2021, said he's doing grossly neurologically well.

01:31:52  10  He's fine.  There's no reason why he can't get back and

01:31:56  11  engage in normal activities.  That's his records to support

01:31:59  12  that.

01:31:59  13           Alvin Polk, this is a timeline of his accidents, one,

01:32:03  14  two, three, four, five, six, seven accidents and then one

01:32:10  15  before which he testified to he fell at work at Aguilar

01:32:15  16  Construction resulting in a torn rotator cuff in his right

01:32:18  17  shoulder.  All right.  This is -- remember, I took his

01:32:20  18  deposition.  Any back pain -- or any back or neck pain, any

01:32:23  19  prior treatment at all before this accident?  No.  He said

01:32:25  20  bumps and bruises, but no significant issues at all.

01:32:29  21           MRI one year before the accident or a little bit

01:32:33  22  longer -- more than a year before the accident, July 2016.

01:32:37  23  Here's the MRI report:  Neck and radicular pain down both

01:32:45  24  extremities.  The symptoms began after a motor vehicle

01:32:48  25  accident in April 2016.  C3 and that's the level he was

01:32:54 **1**    operated on, a broad-based, right central and right posterior

01:32:57 **2**    lateral disc herniation extends 0.25 centimeters into the

01:33:02 **3**    spinal canal, causes posterior displacement and some

01:33:05 **4**    compression of the ventral root of the right C4 nerve.  He

01:33:08 **5**    did not -- how can you not remember that?  And then also low

01:33:11 **6**    back pain, radicular pain, extends into the right and lower

01:33:15 **7**    extremity.  This is all before the accident.

01:33:18 **8**        And then August 4, 2016, Dr. Mulvey refers him to a

01:33:23 **9**    neurosurgeon for further evaluation and options and you can't

01:33:26 **10**    remember that?  They're saying there's no treatment after

01:33:29 **11**    that.  The last visit, the last note from the doctor was a

01:33:33 **12**    referral to a neurosurgeon before the accident.  That's a

01:33:38 **13**    timeline of issues.

01:33:40 **14**        Mr. Polk said he had neck pain after the accident.

01:33:44 **15**    Well, the hospital records said no neck pain, no spinal pain.

01:33:48 **16**    Dr. LeBlanc, same thing, and then x-rays are normal, went to

01:33:52 **17**    Liechty.  Dr. Liechty said he was involved in another

01:33:58 **18**    accident in January --

01:33:59 **19**        MR. WELLS:  Can I have two more minutes, Your Honor.

01:34:03 **20**        THE COURT:  You can finish.  You can finish.

01:34:04 **21**        MR. WELLS:  Testified that he should be at maximum

01:34:07 **22**    medical improvement in 2019.  In October of 2019, Dr. Liechty

01:34:11 **23**    -- and that's his testimony -- notes that he was doing

01:34:14 **24**    neurologically well and back at work.  Mr. Polk went back to

01:34:17 **25**    work.  And, look, that's his report that supports that.

01:34:21  1          He was active before the -- and then he had another

01:34:23  2     accident in April of 2020.  Mr. Polk did.  He was quite

01:34:28  3     active and a productive member of society.  In the upper

01:34:32  4     right-hand corner, that's the record that supports that.  Was

01:34:36  5     doing well.  He was involved in another accident, 2021.

01:34:39  6          And these are all the telephone contacts that Mr. Fey

01:34:42  7     talks about with all these individuals.  We heard about that

01:34:46  8     from Mr. Fey about all these individuals with similarly

01:34:50  9     suspicious accidents including Cornelius Garrison, who you

01:34:53  10    heard Mr. Fey testify about, all these contacts on the day of

01:34:59  11    the accident.

01:35:00  12         THE COURT:  I'm just giving you the two minutes you

01:35:03  13    asked for because I gave her a lot of extra time during the

01:35:08  14    trial.

01:35:08  15         MR. WELLS:  That's suspicious at best, suspicious at

01:35:12  16    the least, staged at the worst.

01:35:19  17         Base your conclusion on the evidence that was

01:35:22  18    presented in this case.  As I stated at the beginning of the

01:35:25  19    case, it's a matter of credibility and we've shown

01:35:29  20    consistently based on the records, not on a timeline that's

01:35:33  21    created for a closing argument, but on the actual evidence in

01:35:37  22    the case.

01:35:38  23         Mr. Collins and Mr. Polk also testified that they

01:35:40  24    haven't paid one red dime towards their medical expenses.  It

01:35:44  25    was all orchestrated by their attorney.  It's not a

01:35:51  **1**  coincidence that all these phone calls were made and that

01:35:54  **2**  there was such similarities of the circumstances surrounding

01:35:58  **3**  the allegations of this accident.

01:36:01  **4**      You also heard Dr. Kounlavong -- Officer Kounlavong

01:36:06  **5**  who admitted that it's possible this accident could have been

01:36:09  **6**  staged.

01:36:09  **7**      That was his testimony.  The amounts that the

01:36:12  **8**  plaintiffs are seeking in this case is frankly an insult.

01:36:15  **9**  It's an insult to this court.  It should be an insult to you

01:36:20  **10**  that they're coming in here based on all the evidence that

01:36:21  **11**  you just saw, that they're coming here asking for that amount

01:36:24  **12**  of money or any amount of money.

01:36:26  **13**      Based on the evidence, I ask you to conclude because

01:36:30  **14**  the evidence supports that this accident was in no way the

01:36:33  **15**  fault of Mr. Ingle and the plaintiffs aren't entitled to

01:36:37  **16**  anything.  And I thank you for your time.

01:36:44  **17**      THE COURT:  I'll now charge the jury.  Can you bring

01:36:47  **18**  up the --

01:36:48  **19**      MS. MOTTA:  I think I had like a minute remaining.

01:36:51  **20**  May I counter just real quick?

01:36:55  **21**      THE COURT:  I don't give rebuttals.  Is that what you

01:36:55  **22**  want?

01:36:55  **23**      MS. MOTTA:  It was a one-minute rebuttal, yes, Your

01:36:55  **24**  Honor.

01:37:00  **25**      THE COURT:  Did she have a minute left?

01:37:05  1          MS. MOTTA:  She has 30 seconds remaining.

01:37:06  2          THE COURT:  I'll give you 30 seconds.

01:37:09  3          MS. MOTTA:  I would just like to end with the fact of

01:37:11  4    they showed the records and they showed everything, but what

01:37:14  5    they didn't show is they made allegations that now all of a

01:37:18  6    sudden my clients hit the 18-wheeler.  No one has testified

01:37:22  7    in that.  No one made any allegations to that.

01:37:24  8          In regards to the medicals, there clear was the

01:37:27  9    comment of exacerbation.  If it was an exacerbation after

01:37:30  10   this collision, it's still related to the collision here.

01:37:33  11   The MRIs for both clients were done in October of 2017.  That

01:37:37  12   subsequent collision that shows any type of exacerbation is

01:37:42  13   related from the August one.  So I would just like you to

01:37:44  14   look at the totality of the evidence on that.  So I really do

01:37:47  15   appreciate for your time.  Thank you.

16       (Jury charge and verdict written stenographically but not

17                          transcribed.)

18                        *  *  *  *

19       (WHEREUPON, the proceedings were adjourned.)

20                        *  *  *  *

21

22

23

24

25

1                    REPORTER'S CERTIFICATE

2           I, Nichelle N. Wheeler, RMR, CRR, Official Court
   Reporter, United States District Court, Eastern District of
3  Louisiana, do hereby certify that the foregoing is a true and
   correct transcript, to the best of my ability and
4  understanding, from the record of the proceedings in the
   above-entitled and numbered matter.

5

6                     /s/ Nichelle N. Wheeler
                     Official Court Reporter

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25