```
 1                  UNITED STATES DISTRICT COURT
                    EASTERN DISTRICT OF LOUISIANA
 2

 3    ****************************************************************

 4    WAYLAND COLLINS, ET AL

 5                                CIVIL ACTION NO. 18-7465 "G"
      VERSUS                      NEW ORLEANS, LOUISIANA
 6                                WEDNESDAY, JULY 29, 2020, 10:00 A.M.

 7

 8    JOHN C. BENTON,
      DOING BUSINESS AS
 9    Q & M MOTOR TRANSPORTS,
      ET AL

10    ****************************************************************

11

12             TRANSCRIPT OF MOTION HEARING PROCEEDINGS
           HEARD BEFORE THE HONORABLE NANNETTE JOLIVETTE BROWN
13                  UNITED STATES DISTRICT JUDGE

14

      APPEARANCES:
15

16    FOR THE PLAINTIFFS:    MOTTA LAW FIRM
                             BY:  VANESSA MOTTA, ESQUIRE
17                           855 BARONNE STREET, 2ND FLOOR
                             NEW ORLEANS, LA 70113
18

19                           BRUNO & BRUNO
                             BY:   JOSEPH M. BRUNO, ESQUIRE
20                           855 BARONNE STREET, 3RD FLOOR
                             NEW ORLEANS, LA  70113
21

22    FOR THE DEFENDANTS:    LARZELERE, PICOU, WELLS, SIMPSON, LONERO
                             BY:  MORGAN J. WELLS, JR., ESQUIRE
23                           TWO LAKEWAY CENTER
                             3850 N. CAUSEWAY BOULEVARD, SUITE 500
24                           METAIRIE, LA  70002

25
```

**_OFFICIAL TRANSCRIPT_**

1    APPEARANCES CONTINUED:

2

3    OFFICIAL COURT REPORTER:    CATHY PEPPER, CRR, RMR, CCR
                                 CERTIFIED REALTIME REPORTER
4                                REGISTERED MERIT REPORTER
                                 500 POYDRAS STREET, ROOM B-275
5                                NEW ORLEANS, LA  70130
                                 (504) 589-7779
6                                Cathy_Pepper@laed.uscourts.gov

7

8    PROCEEDINGS RECORDED BY MECHANICAL STENOGRAPHY.   TRANSCRIPT
     PRODUCED BY COMPUTER-AIDED TRANSCRIPTION.

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

*OFFICIAL  TRANSCRIPT*

1                           **I N D E X**

2

3                                                            <u>PAGE</u>

4

5    MS. MOTTA.......................................    5

6    MR. WELLS.......................................    9

7    THE COURT.......................................   25

8    MR. WELLS.......................................   25

9    MS. MOTTA.......................................   25

10   MR. WELLS.......................................   27

11   MS. MOTTA.......................................   27

12   MR. WELLS.......................................   28

13   MS. MOTTA.......................................   29

14   THE COURT.......................................   29

15

16

17

18

19

20

21

22

23

24

25

1                    **P-R-O-C-E-E-D-I-N-G-S**

2              M O R N I N G   S E S S I O N

3               WEDNESDAY, JULY 29, 2020

4              (VIA ZOOM VIDEO TELECONFERENCE)

5

6

7          THE DEPUTY CLERK:  18-7465 Collins versus Benton.

8              Counsel, can you state your appearance for the

9    record.

10         MR. MOTTA:  Good morning, Your Honor.  Vanessa Motta

11   here for the plaintiffs, Wayland Collins, Candy Collins, and

12   Alvin Polk.

13         MR. Wells:  Good morning, Your Honor.  Morgan Wells for

14   Q & M Motors, Mark Ingle, Northland Insurance Company, and we

15   also represent Innovative Transport Solutions, Inc., and

16   Automotive Transport Services, Inc.

17         MR. BRUNO:  Your Honor, I'm sorry, Joseph Bruno with

18   Ms. Monica.  I'm sorry.

19         THE COURT:  Mr. Bruno, you're not participating by

20   video?

21         MR. BRUNO:  That's correct.  Your Honor, I'm just

22   observing, thank you.  I'm not really dressed, to be honest

23   with you; so, I'm embarrassed.

24         THE COURT:  Okay.  So, you're not really making an

25   appearance, or are you making appearance with Ms. Motta, who is

*OFFICIAL TRANSCRIPT*

1    making the argument?

2            MR. BRUNO:  Yes, ma'am.

3            THE COURT:  You are counsel of record?

4            MR. BRUNO:  Yes, I am counsel of record, and you are

5    correct, I am here to observe, but I am on the record and the

6    part of the record.

7            THE COURT:  All right.  So, Ms. Motta, it's your motion

8    to exclude the testimony; so, you can proceed.

9            MS. MOTTA:  Yes.  Your Honor.  Thank you.

10            As you know, this is a Daubert motion.  We are

11    here to exclude Louis Fey for his testimony.  As you know, the

12    Court is very well acquainted as being the gatekeeper of all

13    evidence that has to be provided as an expert and to determine

14    what is an expert and what can be discussed about as an expert

15    is when an expert provides scientific or specialized knowledge

16    that will help the trier of fact and with helping the trier of

17    fact is using these methods that are scientific or that are

18    known.

19            Here, Mr. Fey has been shown to not provide any

20    of the such except that is an insurance adjuster.  In this

21    claim, we have no insurance-adjuster issues.  We don't even

22    have a claim process issue.  He wants to come in and talk about

23    fraud allegations and indicators.  But the key words that are a

24    factor at issue is that he uses words like *possible* or

25    *potential* and not providing any scientific data to back it up.

1          I know this court has been aware from multiple

2     times but the fraud allegation was denied by Judge North

3     because there was nothing to support any particularity; and so,

4     here we have Mr. Morgan Wells trying to do a backdoor and let a

5     lay witness essentially just regurgitate everything he tried to

6     allege to the Court that was already once denied.

7          Mr. Fey has been denied a multitude of times.

8     I've actually, with no disrespect to Mr. Fey, have never filed

9     a motion in *limine* to have so many exclusions on one expert in

10    regards to fraud indicators, as well as going outside the scope

11    of providing possible legal conclusions, and also as providing

12    testimony outside his expertise.

13          In this case he does the identical same factor.

14    He provides codes.  He provides conversations as far as

15    CPT codes, which he's not an expert in the CPT codes.

16    Mr. Wells already has an expert to discuss that that is

17    actually in that realm.

18          He also talks about medical causation, which he,

19    and no disrespect to his training, but he has a Bachelor's

20    degree in business administration and has a certificate in

21    insurance.

22          Furthermore, he then starts talking about the

23    possible fraud indicators and just uses testimony from the

24    witnesses, which I have put in my supplemental memo

25    *United States v. Mullins,* where, if you're just going to

**OFFICIAL TRANSCRIPT**

1    regurgitate what witnesses have said and not provide any of

2    your own facts and evidence, then it's just a backdoor hearsay

3    which should not be held in this courtroom and should be

4    excluded in full.

5            I am -- essentially the biggest case that really

6    shows exactly what he's doing was the fact that in his CV he's

7    completely misrepresenting what he has done in the past.  He's

8    actually held back multiple cases in his CV; so, I can't even

9    rely on his CV as to what he has done.

10            The reason why he held back those multiple cases

11   was because he was excluded for the very same issue we are here

12   today; so, we can't even follow the procedures of Rule 37(c).

13   The only type of fraud indicator misrepresentation is actually

14   10, which is résumé.

15            As far as the most current case that he was

16   excluded was the Judge Piper Griffin case where she

17   specifically said -- Judge Griffin said that she was not going

18   to allow a lay witness just to regurgitate and do these

19   possible fraud factors when it has not even been admitted.

20   This was not admitted, this is not even a claim for it, and

21   that is why he was excluded then, and that's why he should be

22   excluded in full now.

23            If my client had an insurance claim issue or the

24   fraud testing of it, then that could be one thing, but that's

25   not the case here; so, he doesn't bring anything to the trier

1    of fact as to why he should be brought.

2         THE COURT:  Articulate for me what are the salient

3    issues of fact at trial.

4         MS. MOTTA:  So, as far as defense or as far as

5    plaintiff?

6         THE COURT:  Both.

7         MS. MOTTA:  Okay.  For us, for the plaintiff --

8         THE COURT:  I mean, there is a dispute as to whether

9    the accident actually occurred?

10         MS. MOTTA:  Well, the way the defense have said is that

11    the accident, we don't know, did occur, but if it occurred, it

12    wasn't the fault of the defendant, and if it was the fault of

13    the defendant, it was minor, and if it wasn't minor, then the

14    injuries were not caused by the accident.

15              So, there is so many factors that are invariable,

16    but the real fact is that their driver was cited, and their

17    driver pled guilty.  He didn't go and --

18         THE COURT:  Your position is that none of this is a

19    claims issue.

20         MS. MOTTA:  None this --

21         THE COURT:  The insurance companies get involved

22    whether or not -- I'm going to let Mr. Wells answer that.

23              Are you finished with your argument?

24         MS. MOTTA:  The only thing I was going to say, you

25    know, as far as the claims, you know, when they have adjusters,

*OFFICIAL TRANSCRIPT*

1    I know there was a comment that Mr. Fey said that he is going

2    to -- one of the factors that he follows, even though there is

3    no methodology whatsoever, but he says that, you know, these

4    are things that insurance adjusters review as an insurance

5    adjuster.  Their own adjusters didn't even allege any type of

6    potential or possible fraud indicators, and that's the adjuster

7    that's on the claim.

8             So, you have someone that knows nothing about the

9    claim regurgitating things from other experts that are not even

10   admissible.  Even Dr. Baratta already got excluded for medical

11   causation, and he's including that in his report.  So, he

12   doesn't bring anything to this with his expert, which is why,

13   again, he's been excluded.

14        THE COURT:  So, Mr. Wells, so you plan to offer him as

15   an expert in the fields of claims handling and investigation,

16   and why is that relevant?

17        MR. WELLS:  Well, and in particular --

18        THE COURT:  If that's true, why is that relevant?  Is

19   that what you're trying to offer him as?

20        MR. WELLS:  And specifically with respect to the

21   identity of fraud indicators within a claims investigation.

22   His qualifications have never been questioned.  His methodology

23   has never been questioned.

24        THE COURT:  Okay.  I'm trying to see if his testimony

25   is relevant since Judge North excluded -- I am correct but I

*OFFICIAL TRANSCRIPT*

1    have a couple of these cases -- he did exclude the claims, your

2    defense of fraud?

3        MR. WELLS:  No, no, no.  I want to clarify that,

4    Your Honor.  The only thing that Judge North excluded was the

5    counterclaim because -- because of the technicalities of

6    asserting that counterclaim under Louisiana law.

7        He did allow us to assert the affirmative defense

8    of fraud, so it's pled as an affirmative defense but not as of

9    the counterclaim; so, it's technically -- it's an issue in the

10   case.

11       We intend to use Mr. Fey to utilize his 30 years

12   of experience, his vast experience in SIU investigations, in

13   setting up a fraud unit with Ohio Casualty, to identify for the

14   Court because -- identify for the jury because the jurors

15   typically don't have any information on fraud investigations,

16   how claims are handled.

17       Even bring his perspective as a claims handler

18   and specifically identity of fraud indicators based on the

19   testimony of the witnesses, the physical evidence, the

20   inconsistencies, the fact that there are -- as an example, in

21   this case we have -- and in multiple other similar cases like

22   this, there are multiple occupants, all of whom have undergone

23   surgery after the accident.

24       THE COURT:  Okay.  This is what troubles me:  I'm not

25   sure that, you know, we don't let an expert come in and

*OFFICIAL TRANSCRIPT*

1    substitute the job of the jury; so, they can't weigh the

2    credibility -- as you're putting forth that evidence of all the

3    things you just said, I don't know why you need an expert to

4    tell you something about maybe that the number of people in a

5    car might indicate something or, you know, that's evidence you

6    put forth, and it's for the jury to come to a conclusion about

7    that.

8              So, this is what's troubling me about what you

9    want to -- because, first of all, you've got to get that

10   underlying evidence in, and then, again, it seems like argument

11   you make to the jury based on that evidence, and that -- that's

12   their job.

13             You have to convince me that, you know, that

14   you're not -- you can't let, you know, an expert come in and

15   make conclusions of law and, also, not substituting the fact,

16   you know, he's just a common, everyday fact-finder.

17             Why do you need somebody with some expertise to

18   just come in and say, you know, like, agree with you about

19   facts, right, and your conclusion of facts?  This is where your

20   expert is getting a little fuzzy.  Is this, I guess, to go back

21   to the underlying and fundamental issue, is there a claim -- I

22   mean, is there an issue in the case in his underlying field of

23   expertise, and that is, this is really a claims issue?  I mean,

24   that's what I'm trying to get to.

25             I mean, we see these kinds of experts in that

1    area.  I understand if you have an affirmative defense, and you

2    can put that evidence, you know, in front of the jury, you

3    know.  What you need to convince me about is that you need an

4    expert to make conclusions, and that's just not something that,

5    you know, that's what the jury is going to figure out.

6              Why do you need some special knowledge to come to

7    the conclusion that maybe this was not -- this accident was set

8    up in some fraudulent way?  Why do you need an expert?  What

9    does he add beyond what the jury or an average fact finder can

10   come to?

11        MR. WELLS:  He has the expertise to identify all of the

12   evidence that are indicative of a red flag or a claim that was

13   presented as fraud.  We -- he will not render any legal

14   opinions.  He will identify all the factors in cumulation and

15   render an opinion that all of this --

16        THE COURT:  You know what you're going to be doing,

17   you're going be giving those facts.  You have to first.  The

18   thing that throws me is sometimes experts can rely on hearsay,

19   and they can rely on inadmissible evidence to come to a

20   conclusion.

21        MR. WELLS:  That's right.

22        THE COURT:  Right.  So, that's what, you know, is

23   troubling me, I mean, you know, about what you're really

24   getting him in here to do and whether or not I'm comfortable,

25   you know, to allow him to do that.

                         *OFFICIAL TRANSCRIPT*

1              What is the claims adjustment issue here?

2         MR. WELLS:  It's not necessarily just specific.  That's

3    why I go back to the identity of the fraud indicator.  It's his

4    specialty in identifying factors within a claim that are

5    indicative of fraud, and he's got a multitude of issues.  His

6    report is about 35 pages, and not all of them will be

7    admissible.

8         THE COURT:  But he can't come to a conclusion -- he

9    can't come to a conclusion about fraud.

10        MR. WELLS:  He can render an opinion as to whether in

11   his opinion, based on all of the indicia of fraud (speaking

12   simultaneously) --

13        THE COURT:  But isn't that -- but isn't that, in fact,

14   a legal conclusion?

15        MR. WELLS:  It will be a legal -- it will be a legal

16   determination for the jury to agree as to whether it's fraud or

17   not, but he can accumulate all the factors (speaking

18   simultaneously) --

19        THE COURT:  Okay.  But the jury -- the jury doesn't

20   come to the legal conclusions, right?  The jury just makes

21   findings of fact.  I tell them what the law is, and they just

22   find facts.

23        MR. WELLS:  But they have to determine whether or not

24   the defendants are liable, whether there are any injuries.  I

25   mean, those are kind of fact and legal issues.  Whether the

**OFFICIAL TRANSCRIPT**

1    defendant is liable.  I mean, that's a legal determination

2    which the jury is going to have to make.

3                One of the affirmative defenses is fraud, and

4    part of that determination by the jury is whether this claim

5    was fraudulent, whether it was staged, and whether the claim

6    was fraudulently asserted.

7                The expert provides particularly unique expertise

8    based on his almost 40 years of experience investigating fraud

9    claims as to what indicia of fraud is and what the factors are.

10               We can make the argument, but we don't have the

11   opinion in the insurance industry.  It's based on the vast

12   experience what are the indicators of a claim that is

13   fraudulent.  He will be able to testify as to what evidence has

14   been presented in this case that are indicative of fraud, and

15   he will support those opinions by the evidence presented in the

16   case.

17               THE COURT:  If I let him.

18               MR. WELLS:  If you let him.

19               THE COURT:  If I let him.

20               MR. WELLS:  Which a multitude of other judges -- the

21   only reason -- and it goes to the weight of the evidence.  If

22   Ms. Motta wants to cross-examine him, she can cross-examine

23   him, but all of the other judges in all of the other cases

24   we've cited in our case, they've allowed him to testify in his

25   area of expertise subject to being cross-examined at trial.

*OFFICIAL TRANSCRIPT*

1    The only thing that (speaking simultaneously) --

2              THE COURT:  So, point to me -- point me to -- point to

3    me the cases where he was actually allowed to testify on red

4    flags and fraud indicators.  Specifically, that.

5              MR. WELLS:  In the *Saacks* case, Judge Fallon allowed

6    him to testify concerning standard practices and procedures,

7    but that involved a fraud claim.  Mr. Fey, if Ms. Motta had

8    taken his deposition, he would have elaborated on what he

9    testified about in that case, and that was -- he provided

10   testimony relative to fraud indicators in that case.  That was

11   the *Saacks* case by Judge Fallon.

12             THE COURT:  Okay.  *Antoine Saacks*?  How long ago was

13   that?  25 years ago?  30 years ago?

14             MR. WELLS:  2017.

15             THE COURT:  I didn't realize *Antoine Saacks* is back.

16   Okay.

17             MR. WELLS:  No, that's a different *Saacks*.  That's not

18   *Antoine Saacks*.  That's not the New Orleans Police Department.

19   Yeah, that is an older case.  This is -- I don't know what his

20   first name is.  No, it is an *Antoine Saacks*.

21             THE COURT:  Yeah, what I thought.  It was the same one.

22             MR. WELLS:  No, it's a 2017 decision.

23                  Then Judge Morgan --

24             THE COURT:  So, wait.  Look, tell me, I want to know on

25   the record, you're telling me that that is a -- because, look,

1    there is just so many -- I'm just going to tell you -- there is

2    just so many pages of argument and documents for this one

3    motion, that's why I asked Ms. Motta to try to streamline the

4    arguments here, and that's what I'm trying to get you two to do

5    for me now.

6              I am not inclined to prevent someone from

7    testifying as an expert, but I have to be careful about what

8    their expertise is and what we're allowing -- what I'm going to

9    allow them in to testify about.

10             So, I'm going to let -- so, Ms. Motta, he says

11   that in this *Saacks* case that Mr. Fey was certified as a red

12   flags -- no, you didn't say *red flags* expert, just fraud

13   indicator.

14   MR. WELLS:  In insurance practices and procedure, so

15   practices and procedure within the insurance industry, but

16   Mr. Fey (speaking simultaneously) --

17   THE COURT:  So, wait, wait, wait.  Stop, stop, stop.

18   That's fraud.  Insurance practices and procedures, that's not

19   the same thing as red flags and fraud indicators.  What

20   troubles me about you trying to classify, you know, his

21   expertise in red flags and fraud indicators, because that's

22   kind of like evidence.

23             I keep thinking it's for the jury to decide if

24   these things are red flags and fraud indicators, not an expert

25   to come in and tell them.  You put the evidence and they

*OFFICIAL TRANSCRIPT*

1    decide, right?  That's their credibility call.  That's their

2    fact-finding job, whether it is a red flag or fraud indicator.

3    That's not the same thing as industry practices, and that's

4    kind of broad.

5                So, I'm telling you -- I'm telling you I want to

6    be very clear that that's where I got trouble, you know, if

7    he's -- and for a lot of this, Ms. Motta, we do use -- you will

8    have the opportunity to cross-examine him and break down all

9    these -- for the jury, I mean, what he's -- the holes in his --

10   perhaps his expertise and how other courts have used some of

11   his cases and opinions.  That's your job to bring that out to

12   the jury.

13               I'm just trying to figure out by the argument and

14   the both of you where I draw the line.  I'm comfortable with

15   him talking about claims handling and investigation; although,

16   I'm not sure that that's actually at issue literally, but I can

17   see, you know, I guess -- I guess, you know, generally, you

18   haven't convinced me, Mr. Wells, this is a claims-handling

19   issue.  This is when people in the insurance industry -- I

20   don't want to articulate for you, I'm just trying to figure

21   out -- I'm letting you know I've been very clear I'm not

22   comfortable with an expert telling a jury what is a red flag or

23   a fraud indicator.  I think that's a conclusion that they make,

24   and I don't know that that's -- I'm not convinced that you need

25   an expert to tell you that, that that is a comment.

1    MR. WELLS:  That's what the *Daubert* allows, Your Honor.

2    It allows somebody with particular expertise, and this is not

3    just an insurance --

4    THE COURT:  That's where you're not hearing me.  I'm

5    telling you I don't think you need particular expertise to look

6    at evidence and say that's a red flag or not.  That's -- you're

7    not answering my question.  Why do you need particular

8    expertise for that?  It's your job as a lawyer, right, to put

9    before the jury things you think are kind of suspicious and

10   look like maybe this isn't for real, you know.  Were those

11   things -- was this particular person -- again, because I

12   haven't gotten in deep because there is just so many pages of

13   this -- so, he wasn't the claims handler in this case, right?

14   MR. WELLS:  That's correct.  He's a retained expert,

15   and I don't understand what the basis of Ms. Motta's comment

16   about the claims handler not asserting a fraud claim.  That's

17   completely meritless.  That's irrelevant.

18        The claims adjuster I'm reporting to is

19   intimately familiar with this case and is intimately aware of

20   the fraud assertions that we've pled in this case.  I don't

21   know where that comment came from.

22   THE COURT:  Is he going to testify?

23   MR. WELLS:  No, he's not going to testify.  He's not a

24   witness at trial.  He's the insurance adjuster to whom I report

25   and who -- for the insurance company that has coverage for

*OFFICIAL TRANSCRIPT*

1  Q & M Motor Transports and Mark Ingle.  That comment is

2  irrelevant.

3        THE COURT:  Okay.  So, what you're telling me is is the

4  claims adjuster and the claims adjustment process in this case,

5  right, there was no indication or claim of -- I mean,

6  indication of fraud so -- but now at trial, you're trying to

7  bring an expert in to say that there was?

8        MR. WELLS:  Well, (speaking simultaneously) --

9        THE COURT:  He didn't find any fraud?

10       MR. WELLS:  -- information gets developed through the

11  discovery process.  When they open up a claim, all they are

12  aware of is that we reported an accident, and we're opening up

13  a file, and then the claim gets investigated.  Through the

14  discovery process is where we -- through the deposition of the

15  investigating officer, through the identity of the medical

16  records, through the deposition of the plaintiffs, that's when

17  information gets developed to provide evidence that are indicia

18  of fraud.

19            The purpose for which we need an expert is

20  because it's not within the jury's province.  They are not

21  familiar with a claims-handling process.  They are not familiar

22  with -- on an everyday basis, they are not familiar with what

23  pieces of evidence and what inconsistencies are indicative for

24  a fraud, and that is the purpose for which we have an expert to

25  tie that together for the benefit of a jury, and that's what

*OFFICIAL TRANSCRIPT*

1    *Daubert* will allow is an expert to assist the jury to make that

2    determination.

3          It's not going to make the determination for the

4    jury.  The expert will assist the jury in analyzing that

5    information, and that's why we need an expert, and that's what

6    all these other -- in all these other cases, Mr. Fey has not

7    been allowed to provide a legal conclusion or to provide

8    testimony concerning causation, and we will not have him

9    present that testimony, but we will have him provide testimony

10   on all the accumulative evidence that are indicia of fraud to

11   support our affirmative defense of fraud, and it will be

12   assist -- it will assist --

13        THE COURT:  So, what is this evidence you relied upon?

14   Is it evidence in this particular case or is he going to be

15   looking at other or similar cases?

16        MR. WELLS:  Well, a lot of it is in this case, and

17   there are also an inordinate amount of consistent accidents

18   involving very similar fact patterns involving communications

19   among the same individuals, including these plaintiffs, who had

20   communications over just a short period of time, meaning on the

21   day of and the day after the accident -- communications during

22   that period of time.  Those are things that are indicia of

23   fraudulent claims.

24        THE COURT:  Now, would you be able to get that in any

25   way under the rules of evidence or not?

1        MR. WELLS:  Well, we've tested -- we've questioned the

2   plaintiffs about their phone records and who they had

3   communications with, and we've identified them that way, and we

4   will present evidence to that effect at the trial.

5        THE COURT:  All right.  Do you have anything more to

6   add, Ms. Motta?

7        MS. MOTTA:  I do, yes, Your Honor.  A couple things.

8              One:  First, their affirmative defense is not a

9   fraud.  Just so you know, it actually is of staging, but the

10  word *fraud* actually was not allowed by Judge North, and he was

11  very clear on that.

12       THE COURT:  Mr. Wells, do you agree?

13       MR. WELLS:  I'll -- I'll --

14       THE COURT:  No, no.  If you can't answer that question

15  because if he excluded the word *fraud* -- Jacob, go pull his

16  decision.

17       MR. WELLS:  (Speaking simultaneously) It prevented --

18       MS. MOTTA:  It's document (speaking simultaneously).

19       MR. WELLS:  -- not the affirmative defense.  He

20  prevented the counterclaim from being asserted, not the

21  affirmative defense.

22       MS. MOTTA:  The affirmative defense did not have the

23  word *fraud* in any way, shape, or form.  He was actually very

24  thorough in the paragraph he wanted Mr. Wells to copy and paste

25  as far as things that were suspicious, but the word *fraud* was

*OFFICIAL TRANSCRIPT*

1    never put in his paragraph.

2            MR. WELLS:  (Speaking simultaneously) (Inaudible).

3            MS. MOTTA:  While we're waiting for that, the other

4    factor is that the *Saacks* case, the *Saacks* case was actually

5    very, very limited as to what he was an expert as.  It was

6    not -- this was his report for the *Saacks* said that he was

7    acting as an expert witness with regard to insurance industry

8    standards, customs, and practices, and in regards to the

9    underinsured motorist.  Nothing of that had to do with any type

10   of fraud indicators.

11           Then, in fact, that they sought to exclude the

12   defendant made very clear that his purpose was just about the

13   UM claims handling.  Nothing had to do with any fraud

14   indicators.

15           The other issue is the fact that he has been

16   excluded multiple times, that Mr. Wells continues to ignore

17   that it's not even in his CV because he doesn't want this Court

18   or the public eye to see that he has been excluded in regards

19   to fraud indicators.  Judge Griffin was also very specific to

20   say that he was not to discuss any type of fraud indicators.

21           Here is the thing, Your Honor, the reason why he

22   should be excluded is that if he were to go on the stand, I

23   can't even question him on any scientific data or where he has

24   come up with these conclusions because he has essentially

25   regurgitated from outside sources beyond his scope of

**OFFICIAL TRANSCRIPT**

1   expertise.  That is the biggest issue here.

2          The other reason why I brought up about the

3   current adjuster is because he says in one of his testifying --

4   reasons why he will testify is that these are red flags that

5   insurance company adjusters are trained to identify.  If their

6   own adjuster did not identify this that is on an everyday basis

7   on this case, what does he bring to the table as a trier of

8   fact?  All he is doing is regurgitating Mr. Wells what he can

9   say in his closing arguments.

10          THE COURT:  So, Ms. Motta, I actually think that's an

11   excellent area for you to be able to cross-examine him on.  I'm

12   not sure it's a basis to exclude him.

13          Jacob, she said it was Record Document 50.

14          THE CLERK:  Judge, I do not see the word *fraud* in

15   Judge North's opinion.  It's only about one page, and he

16   mentions that the defendants can plead that the accident was

17   staged.

18          THE COURT:  Okay.  So, if your expert -- if you had an

19   expert who wanted to talk about, you know, staging, you know, I

20   could see that, but I'm not -- I'm going to look at this

21   closely because I'm not going to let you -- I'm going to look

22   at Judge North -- Send that to me, Jacob.

23          So, in rendering my opinion, I'm going to look at

24   Judge North's decision, and if there was some, if y'all had

25   oral argument, I'll pull the record because I'm not going to

*OFFICIAL TRANSCRIPT*

1    let --

2        MR. WELLS:  (Speaking simultaneously) Here is our

3    specific affirmative defense -- this was after Judge North's

4    ruling -- defendants plead the affirmative defense that

5    plaintiffs conspired to stage the alleged subject accident and

6    that the alleged subject accident in this case was

7    intentionally caused and/or staged.

8            So, Ms. Motta is right, the word *fraud* is not in

9    there, but *conspired to stage* and *intentionally caused* is part

10   of that affirmative defense.

11       THE COURT:  Okay.  But that's not fraud.  Fraud is

12   something else.  Fraud is something different.  You want to

13   prove a conspiracy, then, you know --

14       MR. WELLS:  Well, it could be a technical difference,

15   but I submit to Your Honor that it's a distinction without a

16   difference in this particular case because intention,

17   conspiring to stage and conspiring to cause the accident, maybe

18   it doesn't make a technical definition of fraud under Louisiana

19   law, but that's our affirmative defense, and that was

20   consistent with Judge North's ruling.

21       THE COURT:  But then that doesn't support me allowing

22   you to let in what, you know, red flags of staging.  You don't

23   need red flags of staging.  Either your expert can testify that

24   there are indicators that it was staged and there was a

25   conspiracy to stage.

*OFFICIAL TRANSCRIPT*

1          MR. WELLS:  Intent to cause the action.  I think it's

2     semantics, Your Honor, but it's all part of the (speaking

3     simultaneously) --

4          THE COURT:  I don't think it -- well, I'm not going to

5     let you do whatever you want.  It's my courtroom, so....

6          MR. WELLS:  I understand, Your Honor.

7          THE COURT:  Let me look at that a little bit more

8     closely and see if I can -- I'm not inclined to exclude an

9     expert.  That's usually not the way I want to go.  I do think

10    vigorous cross-examination is helpful, but I do get concerned

11    when experts start, I think, encroaching on either my job to

12    tell the jury what the law is, so we don't want them making

13    conclusions of law or just, you know, making ordinary factual

14    conclusions that don't really aid a fact finder.  Conclusions

15    of fact that they can determine on their own; so, I'll take

16    this under advisement.

17          Do any of you -- either of you have anything more

18    to add?

19          MR. WELLS:  Just to reiterate that the reasons that he

20    has been excluded and his testimony has been limited is from

21    providing a legal opinion and from testifying about causation

22    (audio distortion).

23          MS. MOTTA:  My return to that is that everything that

24    he is going to try to bring is just a backdoor of hearsay and

25    has not provided any scientific data, where it's going to just

**OFFICIAL TRANSCRIPT**

1    confuse the jury, even if I were to give a vigorous

2    cross-examination, because he cannot respond to the words

3    *potential* and *possible*.

4            There is nothing showing that it is exactly a

5    backdoor.  It is just his opinion, which brings nothing to the

6    trier of fact.  That's the whole reason we have the *Daubert*

7    motions.

8        THE COURT:  Yes, I mean, but experts render opinions,

9    Ms. Motta.  That is what they do, and, you know, I'm not quite

10   sure I understand your argument, because he made a conclusion,

11   that would be objectable, too.  I mean, it's just for the jury

12   to decide whether they believe that he's an expert or not.

13       MS. MOTTA:  Well, it's just that everything he has

14   brought in, he's just an insurance claim handler.  If you look

15   into his website, if you look into his CV, he's just an

16   insurance adjuster for, like, property adjustments, FEMA,

17   nothing that shows that he handles personal injury cases in

18   regards to this, and everything that he throws into his report

19   is outside evidence from other experts.

20       THE COURT:  So, he's had some expertise in

21   identifying -- I don't know that this happens that often.  He

22   had some expertise in identifying if an accident is staged?  Is

23   there an expertise there?

24       MS. MOTTA:  There is nothing of the sort.

25       THE COURT:  I'm talking to Mr. Wells.

**OFFICIAL TRANSCRIPT**

1              MS. MOTTA:  I'm sorry, Your Honor.

2              MR. WELLS:  Yes, Your Honor.  He was -- part of his

3    experience was establishing a fraud unit for Ohio Casualty

4    Company and breaking up a fraud ring in the 1990's in Florida.

5    He's got vast experience.  That's why his particular expertise

6    is in this area.

7              THE COURT:  All right.  But fraud was excluded.  We're

8    not talking about fraud.  It's staging.  You want to make the

9    conclusion that staging this accident amounts to fraud, but

10   Magistrate North told you -- I don't remember why he excluded

11   that affirmative claim, so I can't let you get around that.

12   That's what I'm trying to make you understand, that --

13             MR. WELLS:  In his report, Mr. Fey concludes that based

14   on all the evidence I reviewed, this accident was staged.

15   That's the wording from his report, so we were limited to

16   staged.

17             THE COURT:  Okay.  So, Ms. Motta, if he had limited his

18   expertise to staging, do you think you could mount a sufficient

19   cross-examination to get to the bottom of that if he didn't use

20   the word *fraud*.

21             MS. MOTTA:  I still can't because there is nothing

22   showing any data or any specialized knowledge showing his

23   error, his factors, what he used in order for me to come to

24   that conclusion.  It's literally outside facts from other

25   experts.  That's exactly what he did, which we already have

                          *OFFICIAL TRANSCRIPT*

1    experts in other areas.

2            So, he brings nothing to the trier in fact in

3    regards to staging.  He just says other accidents are similar.

4    There is two fraud rings, and this is why I come to that.  Then

5    he says this is a potential factor.  This a possible factor.

6    He brings nothing to it.  That's for the jury to decide and for

7    Mr. Wells to show that these are possible indicators, but he

8    has (speaking simultaneously) --

9            THE COURT:  Does he have -- is there, like, a

10   four-point test or, Mr. Wells, is there some kind of test that

11   he offers that he has some expertise this is how you identify

12   the staging of an accident?  You see 1, 2, and 3 or some kind

13   of methodology or --

14           MR. WELLS:  (Speaking simultaneously) The

15   methodology -- methodology was developed over years of

16   experience and through treatises that he teaches, and he

17   analyzes discrepancies, inconsistency in the facts, the

18   physical evidence, and the testimony of the witnesses to put

19   forth his opinion that the accident was, in this case, staged.

20   There was an analysis that goes into his determination of

21   whether the claim was staged.

22           THE COURT:  And I have his report, right?  I have his

23   report?

24           MR. WELLS:  It was -- we attached it to our

25   memorandum -- our original memorandum in opposition to the

**OFFICIAL TRANSCRIPT**

1    motion.  It's a very detailed 36-page report.

2        MS. MOTTA:  Your Honor, the only thing, he has never

3    published any treatise, any peer review, any publication.

4    There is nothing -- (speaking simultaneously).

5            Well, he just said that he teaches in the

6    treatise.  Like, there is nothing in his CV that says anything

7    about staging and fraud, and I attached his CV so you can see

8    his résumé.  Nothing states anything about staging or fraud.

9        THE COURT:  Ms. Motta, I think, you know, you rip him

10   apart on the stand, you know.  You bring those things to the

11   attention of the jury.  They will be instructed that they

12   decide, you know, the credibility of or to completely disregard

13   an expert opinion.  That's a standard instruction.  They don't

14   have to believe him.  It's your job to point those holes in

15   what he can provide.

16           But let me take a look again.  I want to be sure

17   of, you know -- I'm not -- there is a first for everything.  I

18   can exclude an expert if I think they need to be excluded, but

19   let me look at this a little bit more closely.

20           Do either one of you have anything more to add?

21       MR. WELLS:  The only question I have is, Judge, I've

22   been sitting down the whole time.  I know it's by

23   videoconference.  I hope the Court --

24       THE COURT:  Oh, that fine.

25       MR. WELLS:  -- we're standing at a podium, so I just

*OFFICIAL TRANSCRIPT*

1   wanted to make sure that was okay.  Kind of late for me to ask

2   this.  I just wanted to make sure it was okay moving forward.

3          THE COURT:  Yeah, well, at this point, it's fine.  I

4   was in the courtroom but there was feedback, so I hope it

5   doesn't offend you.  You don't see the flags because this halo

6   of a field follows me wherever I go.

7          MR. WELLS:  No, Your Honor, this is all fluid for

8   everybody.

9          THE COURT:  I know.  My children don't like it when I

10  Zoom them and I've got the seal.  They are, like, dial it back,

11  mom.  I just need you to send me some money.  I don't need to

12  know you're a fellow judge to say yes.

13         MR. WELLS:  It's been a quick tutelage.  For the past

14  two months, we had to ask our kids how does this Zoom stuff

15  work?

16         THE COURT:  I know.  We didn't know how to do it.  Our

17  children are almost 30.  We had a hard enough time turning the

18  TV on and off.  Now we have all of this stuff going on.

19         MS. MOTTA:  Oh, my daughter just turned 10, and she's

20  mastered Zoom.

21         THE COURT:  Of course.  The younger they are, the more

22  they know.

23         MS. MOTTA:  It makes me feel so -- oh, gosh, I'm

24  becoming ignorant.  She's outdone me already with technology.

25  It's just amazing.

*OFFICIAL TRANSCRIPT*

1            All right.  Thank you, Your Honor.

2        THE COURT:  I appreciate it.  Thank you both.  You'll

3    get a decision soon.

4        MR. WELLS:  Thank you, Your Honor.

5        MS. MOTTA:  Thank you.

6        THE COURT:  Thank you.

7        MS. MOTTA:  Bye.

8        THE COURT:  Bye.

9        (WHEREUPON, at 10:44 a.m., the proceedings were

10   concluded.)

11                    *    *    *

12

13                 REPORTER'S CERTIFICATE

14

15        I, Cathy Pepper, Certified Realtime Reporter, Registered
     Merit Reporter, Certified Court Reporter in and for the State
16   of Louisiana, Official Court Reporter for the United States
     District Court, Eastern District of Louisiana, do hereby
17   certify that the foregoing is a true and correct transcript to
     the best of my ability and understanding from the record of the
18   proceedings in the above-entitled and numbered matter.

19                        *s/Cathy Pepper*
                      Cathy Pepper, CRR, RMR, CCR
20                    Certified Realtime Reporter
                      Registered Merit Reporter
21                    Official Court Reporter
                      United States District Court
22                    Cathy_Pepper@laed.uscourts.gov

23

24

25

                      *OFFICIAL TRANSCRIPT*